Thomas L. WHEELER, Jr., Wheeler Management Company, Inc., Industrial Building Corporation, Inc., Lamar Development Company of Dallas, Inc., and Wheeler, Ltd., Appellants,

v.

NEW TIMES, INC. d/b/a Dallas Observer and Denise McVea, Appellees.

No. 05–00–00704–CV.

Court of Appeals of Texas, Dallas.

May 21, 2001.

---

Russell S. Post, Hogan, Dubose & Townsend L.L.P., Houston, for Appellants.

Donald C. Templin, Haynes and Boone, L.L.P., Dallas, for Appellees.

Before Justices LAGARDE, KINKEADE, and WRIGHT.

### OPINION

WRIGHT, Justice.

Thomas L. Wheeler, Jr. (Wheeler), Wheeler Management Company, Inc., Industrial Building Corporation, Inc., Lamar Development Company of Dallas, Inc., and Wheeler, Ltd. appeal the summary judgments granted in favor of New Times, Inc. d/b/a Dallas Observer and Denise McVea. Appellants sued appellees for defamation after New Times published an article written by McVea.[1] In two issues with multiple subparts, appellants contend the trial court erred by granting appellees' motions

---

1. Appendix A of this opinion contains the reproduced text of the article.

for summary judgment because (1) the article was not substantially true, and (2) it was reasonably capable of conveying a defamatory meaning. We affirm the trial court's judgment.

### Factual and Procedural Background

Appellants own numerous residential rental properties in Dallas. On November 2, 1995, New Times published an article in the *Dallas Observer* about urban rehabilitation and building code enforcement in certain poor minority neighborhoods. A portion of the article featured Wheeler. After the article was published, appellants sued appellees for defamation. Appellants' original petition alleged the article was defamatory because it (1) disseminated false information about the issuance of city code violations to Wheeler for his rental properties; and (2) implied that Wheeler had committed bribery and used improper influence to avoid the issuance of city code violations and demolition orders.

New Times filed a motion for summary judgment alleging it was entitled to judgment as a matter of law because the article did not state or imply that Wheeler engaged in bribery or used improper influence and, therefore, was not defamatory. Several months later, the trial court signed an order granting New Times's motion for summary judgment "as to any claim for defamation or libel arising out of an alleged implication that [appellants] committed bribery or exercised unlawful influence." The order denied the motion "in all other respects." New Times filed an interlocutory appeal in this Court, contending the trial court erred by denying, in part, its motion. We concluded the trial court granted all of the relief requested by New Times in its motion and dismissed the interlocutory appeal for lack of jurisdiction. *New Times, Inc. v. Wheeler*, No. 05–97–01756–CV, slip op. at 3, 1998 WL 205865 (Tex.App.—Dallas 1998, pet. denied) (not designated for publication).

Several months after New Times filed its motion for summary judgment, but before the trial court ruled on the motion, appellants filed an amended petition alleging that, in addition to implying bribery and improper influence, the article defamed Wheeler by implying he (1) does not keep his word, (2) is a "scofflaw," (3) fraudulently misrepresented himself and his intentions to gain special privileges, and (4) is racially bigoted and exploits minority tenants. After we remanded the case to the trial court, McVea filed a motion for summary judgment alleging, among other things, she was entitled to judgment as a matter of law because the article is not defamatory. Thereafter, New Times filed a second motion for summary judgment. In that motion, New Times alleged, among other things, that (1) the complained-of statements are not defamatory, and (2) the alleged implications from the article are not reasonable or defamatory. The trial court granted the motions "as to any and all claims and causes of action" because "the statements and/or implications contained in the article in question are not defamatory and are not reasonably capable of a defamatory meaning as a matter of law." This appeal followed.

### Standard of Review

This Court reviews a summary judgment *de novo* to determine whether a party's right to prevail is established as a matter of law. *Foreness v. Hexamer*, 971 S.W.2d 525, 527 (Tex.App.—Dallas 1997, pet. denied). When reviewing a traditional summary judgment, we apply well known standards. *See* Tex.R.App.P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex.1993); *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 23

(Tex.1990); *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 548–49 (Tex. 1985). The party moving for summary judgment has the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *See* TEX.R.APP.P. 166a(c); *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972).

### Defamation

Whether a publication is capable of a defamatory meaning is initially a question of law to be determined by the court. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000). We construe the allegedly defamatory publication as a whole, in light of the surrounding circumstances, based upon how a person of ordinary intelligence would perceive it. *Id.* An article is defamatory if it "tends to injure a living person's reputation and thereby exposes the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Gaylord Broad. Co. v. Francis,* 7 S.W.3d 279, 283 (Tex.App.— Dallas 1999, pet. denied). If the publication is of ambiguous or doubtful import, a jury must determine its meaning. *Turner,* 38 S.W.3d at 114; *Gaylord,* 7 S.W.3d at 283.

### Discussion

Because the threshold question in any defamation case is whether the complained-of article or statements are reasonably capable of a defamatory meaning, we begin our analysis by determining whether the article defamed Wheeler. *See Musser v. Smith Protective Servs.,* 723 S.W.2d 653, 655 (Tex.1987). If the article or statements are not reasonably capable of a defamatory meaning, then summary judgment is proper. *See Gaylord,* 7 S.W.3d at 283. Moreover, if we determine that neither the article nor the com-

plained-of statements is reasonably capable of a defamatory meaning, we need not determine whether the complained-of statements are substantially true. *See Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 429 (Tex.2000) (holding statement was not defamatory regardless of its falsity and thus any alleged knowledge of its falsity was irrelevant).

On appeal, appellants argue the article contains "numerous factual misrepresentations and false implications about Wheeler" that, taken together, portray him as "a powerful white slumlord who manipulated the Dallas code enforcement system and exploited its racially discriminatory policies to obtain preferential treatment." According to appellants, the article, taken as a whole, falsely and maliciously accuses Wheeler "of manipulating a corrupt and racially discriminatory code enforcement system in West Dallas to secure preferential treatment for himself." In support of this argument, appellants rely heavily on *Gaylord,* a recent opinion from this Court.

In that case, Robert Francis, a criminal district judge, sued a broadcasting company for defamation after it aired a story criticizing the work habits of Dallas County's criminal district judges. *Gaylord,* 7 S.W.3d at 282. Francis complained certain inaccurate statements were defamatory, including that "records suggest Francis leaves the courthouse early 67% of the time and works only a half day 50% of the time. An average work week appears to be about 27 hours." *Id.* We concluded that because the "seemingly scientific statistics" offered for Francis "so deviated from the proposed standard of hard working" offered in the storyline, there was a fact issue about whether the complained-of statements were reasonably capable of a defamatory meaning. *Id.* at 283.

In contrast, the article in this case does not expressly criticize Wheeler.

Rather, the article is critical of Dallas's urban rehabilitation efforts. The majority of the article is directed toward the City's improper demolition of certain properties. The latter part of the article focuses on the Urban Rehabilitation Standards Board (URSB), accusing it of allowing certain individuals "to avoid scrutiny." Wheeler is mentioned as an individual who has not been closely scrutinized because of the willful neglect of oversight agencies. Like Francis, Wheeler complains certain statements in the article are inaccurate. Specifically, Wheeler complains the article is inaccurate by (1) understating the number of violation notices received by him; (2) stating that he improves his properties "by upgrading the community" rather than by fixing code violations; (3) overstating the percentage of rental properties in an area targeted for special housing code enforcement; and (4) overstating the number of "shotgun" houses he owns. However, even assuming the statements are inaccurate, we cannot conclude that a person of ordinary intelligence would perceive the article as implying that Wheeler manipulated or exploited the URSB for his own benefit. Rather, we conclude the article suggests that it is the URSB and the City of Dallas, *not Wheeler*, who are ultimately responsible for the alleged improprieties that are the focus of the article.

The portion of the article about Wheeler begins by describing the neighborhood where a number of appellants' properties are located. A homeowner in the neighborhood is quoted about Wheeler's failure to repair the house she once rented from him, and she discusses similar complaints of other neighbors. The article explains that although Wheeler often refers to himself as a "slumlord," he inherited the properties in poor condition. He has, however, spent the last ten years trying to improve the properties and participates in several

programs "devoted to revitalizing" the neighborhood.

The article goes on to contrast Wheeler's treatment by the URSB with that of Carlos and Dana Jackson, a couple who successfully sued the City of Dallas for unfair and discriminatory treatment regarding their West Dallas properties. The article states that Wheeler received only fifty-five violation notices on his stock of 400 homes in the past three years and has been fined only twice. (Wheeler alleges he told McVea his properties had received fifty-five notices and four citations in one year, not three years.) The Jacksons, on the other hand, received eighty notices on six properties in six months. Not even the Jacksons' attorney alleges that Wheeler "committed bribery or exercised unlawful influence." The Jacksons' attorney explains that the difference in treatment *by the City* "is inexplicable unless you take into account the differences of race and wealth between the Wheelers and the Jacksons." The article finds further fault with the City for inequalities in code enforcement by accusing it of not being prepared for code enforcement and for years merely "tagging" this important job onto different departments. Because the article in this case criticizes the City and the URSB, not Wheeler, we conclude that *Gaylord* is not controlling with regard to Wheeler's claims.

Nor can we conclude that *Turner*, a recent supreme court case, mandates a different result. In *Turner*, the supreme court concluded that Texas law (1) precludes liability when a publication correctly conveys a story's "gist" or "sting" although erring in the details, and (2) provides for liability when a publication gets the details right but fails to put them in the proper context and thereby gets the story's "gist" wrong. *Turner*, 38 S.W.3d at 115. The supreme court concluded a reasonable fact

finder could determine that the complained-of broadcast, through omission of critical facts and juxtaposition of others, left a substantially false impression of Turner's actions. *Id.* at 117–18. This is the converse of the substantial truth doctrine, which precludes liability for a publication that correctly conveys a story's "gist" or "sting," although erring in the details. *Id.* at 115. In this case, appellants contend the facts are inaccurate and the article was not substantially true. Appellants do not, as in *Turner,* allege the article "got the details right but fail[ed] to put them in the proper context, thereby getting the 'gist' wrong." *Id.* Thus, we conclude *Turner* is not controlling in this case.

Moreover, the "gist" or "sting" of the article in this case is criticism of Dallas's urban rehabilitation efforts. The gist of the story is certainly not lost in any inaccurate facts about Wheeler. The article describes the City as having "no vision, no leadership, and very little communication among the departments responsible" for such efforts and accuses the City of "capricious [and] arbitrary" code enforcement. We recognize that the portion of the article about Wheeler suggests he benefitted from the URSB's unequal treatment of landowners in West Dallas. Likewise, we acknowledge that the article suggests the City takes a more lenient approach to people based upon their race or economic status. However, we cannot conclude that the article expressly alleges or implies that Wheeler, as a beneficiary of a purportedly bad system, personally engaged in any criminal conduct, is unethical, or is a liar. Nor does the article imply he somehow "manipulated or exploited the URSB" as alleged by appellants in their claim for defamation. Thus, we conclude the article does not imply Wheeler (1) does not keep his word, (2) is a "scofflaw," (3) fraudulently misrepresented himself and his intentions to gain special privileges, or (4) is

racially bigoted and exploits minority tenants. After reviewing the article as a whole, in light of the surrounding circumstances, and based upon how a person of ordinary intelligence would perceive it, we conclude the article does not defame Wheeler. Therefore, we conclude the trial court properly granted appellees' motions for summary judgment. We overrule appellants' issues.

Accordingly, we affirm the trial court's judgment.

## APPENDIX A

Tearing Down Dallas

A Special Report
RAZING HOPES

Thousands of People in Dallas Need a Cheap Place to Live. So Why is the City Destroying Homes that Could be Saved?

The church ladies fell in love with the old church house the minute they laid eyes on it.

The Lord had blessed them yet again, this time with a home on South Dallas' Dryden Avenue for their fledgling ministry, which they intended to call Church of the Living God Youth Outreach Community Center.

Prayers had been answered, they thought. And look—the little haven sat right on a street corner.

"We decided we wanted that, because a lot of young people usually be standing around on the corner," says Maye Jefferson, one of the elders of the church and its unofficial spokeswoman. "We thought it would be a welcoming place for the— where everybody is somebody."

The property's owner, the Reverend Clifford Frazier of Calvary Temple Pente-

costal Church, wouldn't donate the church building, which is what the ladies really wanted. But he promised them, "I'll sell it so cheap, you would think it was donated."

There was one catch. The old church was under a demolition order imposed by Dallas' Urban Rehabilitation Standards Board because board member Roetta Barrett-White, who lives in the neighborhood, thought it unsightly.

Undeterred, the church ladies paid Frazier $2,000 for the property last summer. The city—several people told them—rescinded demolition orders all the time for good causes. The ladies already had lined up a contractor and several volunteers to fix the place.

Just *wait* till the board heard what they planned for this ministry. The ladies practically bounced off one another, they were so excited.

Finally—an opportunity for the city to be part of an urban rehabilitation success story, an example of citizens and city government working together to revitalize the inner city. Urban rehab boards revel in these kinds of cases—public-relations manna from heaven. The headlines could have read: "Women renovate church in struggling neighborhood. Urban rehab board pleased with progress."

But it didn't happen that way, and here's why.

Dallas' Urban Rehabilitation Standards Board, which decides the fates of homes and other buildings whose owners fail to bring them up to city code, refused to give the women a chance. The refusal is one example of what critics say are often capricious, arbitrary decisions made by the board at its code enforcement hearings.

The city's Code Enforcement department, which, through its inspectors, gener-

ates the cases the board will hear, boasts that 80 percent of the properties it targets get fixed. And city officials say both the board and Code Enforcement staff work daily alongside the Public Works, Streets and Sanitation, and Housing departments to make sure neighborhoods are clean and safe.

But critics contend that the city is running a deeply flawed code-enforcement program—a system set up merely to react to citizens' complaints, with no vision, no leadership, and very little communication among the departments responsible for acting on the URSB's rulings.

Far too often, when faced with decaying homes in low-income neighborhoods, the city employs the most unimaginative approach possible to urban rehab: *tear it down*.

Harvey Giddens, a Los Angeles developer who has won praise for renovating two old apartment complexes on South Dallas' Dixon Avenue, says he's frustrated with city officials' attitudes toward urban rehabilitation. "It seems to me that the opinion [in Dallas] is 'Let's demolish it, then look for funds and start all over again,' " Giddens says. "Often you will have a sincere contractor who wants to halt the demolition process and build up the property, but often he will be talking to deaf ears. It is difficult to get [a property] off the demolition list—it is nearly impossible. And at the same time, the City of Dallas is having a hard time providing low-income housing."

The city's lack of vision also leaves room for individuals to influence the process—such as activist Joe Burkleo, who has lodged thousands of citizen complaints against Dallas properties (see previous story, "Demolition man"). And the lack of departmental coordination leaves room for others to escape scrutiny, such as West Dallas slumlord Tom Wheeler, whose di-

lapidated rental homes seldom get cited for code violations. (Only 55 code violation notices have been issued during the last three years, against Wheeler's 400 rental homes, most of which are in poor condition.)

City and court records show that Dallas' urban rehab efforts are, in fact, rife with inequities. This is a city where poor homeowners and small-time landlords often get run over and powerful landlords are coddled. It is a city where Urban Rehabilitation Standards Board hearings deteriorate into cheap theater, its members handing down rulings seemingly based on whim. Citizens' rights are often overlooked and sometimes plain ignored, and inadequacies in the system have resulted in improper demolitions of homes.

Code Enforcement officials admit their department has its problems. But urban rehab is an evolving industry, they say, and Dallas is doing a good job of it, despite its unavoidably controversial aspects.

"Some people will say we are harassing them, and their neighbors might say we are not doing enough," says Ramiro Lopez, assistant director of Dallas' Code Enforcement department. "We walk a fine line in code enforcement, and you know what? I think we walk it pretty good."

Maye Jefferson and her sisters had been holding church in their homes ever since Jefferson's son Charles received the call to the ministry. "We decided we wanted our own church," she says. "We wanted an outreach center for young people and lost people. All the people nobody wants, we want them."

With her stout build and shock of cotton-candy hair, Jefferson is the image of the gentle church lady; people who know her call her Ma'Dear.

The sisters took turns holding services at home. One Sunday, Willie Blake would host services at her house; the next Sunday, Kassie Woolbright might have it at hers.

The—"Bless the Lord"—the ladies heard about the old church house on Dryden. "We asked God to give us a church so we could worship in it," Jefferson says. "And he provided it."

The ladies journeyed to City Hall and signed up to plead their case of the condemned building at an Urban Rehabilitation Standards Board hearing. That day, August 14, 1995, saw a relatively light docket; about 20 people had applied to testify before the board.

The ladies showed up with high hopes, all hairnets and stockings, and when it was their turn, stood before the imposing panel of seven board members to humbly ask the city to let them save their church.

"We were thinking that the city would let us fix it up," Jefferson would recall later. "If that old black Ms. White wouldn't have butted in ... If they would just go on and let us have it, we would have it up in little or no time."

The Reverend Clifford Frazier had owned the small converted frame house for more than 10 years. For several years, he rented it out to a day care center, but when that business went under, it left the old church vacant. The building grew shabby, even though its foundation remained sound.

When Frazier was summoned by the board for code violations in 1993, he told them he was interested in finding a buyer for the house. Another church, perhaps.

"The rest of the board seemed comfortable with the proposal," Frazier recalls. "But Ms. White [board member Roetta Barrett–White] was adamant about not having another church in her neighbor-

hood. She was demeaning and quite vitriolic. Her suggestion was that we denigrate the neighborhood by our existence. She said she would see to it that it gets demolished."

At the church ladies URSB hearing two years later, however, White showed no sign of wanting the church demolished—at first. Instead, she made a motion to allow the ladies to repair the church. Then board chairman Darwin Gaines moved to demolish the church—which got a second.

The church ladies asked again for a chance to fix up the church—which, for the most part, just needed a good paint job and replacement of some rotted wood. (The house next door appeared in worse shape, and several homes on the street display severe structural problems even today.)

After swearing to board member Norma Self—in response to an unusual board query—that they had enough money, the ladies told the board they were ready to get to work.

Then White—abruptly changing her position, for no evident reason—began arguing for demolition.

"You are all middle-aged women," White remarked disdainfully from her perch in Dallas' city council chambers. "You can't even paint that building, much less anything else."

"You don't know what we can do, Ms. White," Jefferson answered plaintively. "If you just give us a chance, we can do it."

The ladies were begging now, desperately looking about for a sympathetic face among the board. But the members stared back impassively.

Ms. White shook her head. The church must come down.

"Have you been inside?" one of the church ladies asked.

"I don't have to go inside," White replied. "We walk the streets every day. I do not want another church in my neighborhood." (In fact, none of the board members present that day had ever stepped inside the church, even though they are encouraged to tour buildings, when possible, before the hearing.)

"Why, Ms. White?" Jefferson pleaded. "Why won't you give us a chance? We can do it, God is on our side."

"Because I don't want any more churches in my neighborhood!" White yelled back.

Then board member Helen Saint chimed in: "Have you thought that God might not want you to have this church?"

But clearly, this was showtime for Ms. White. She had endured, quietly and indifferently, the last few citizens before the board, occasionally chatting on the phone or staring blankly into space. But now she came to life—treating the audience to an impassioned discourse on struggling neighborhoods, irresponsible owners, and nasty buildings. "This is what destroys the neighborhoods," she proclaims. "To have this piece of *junk* sitting there."

"I don't think that's a piece of junk," Jefferson replied.

Swint piped up again. The villain, she said, was the Reverend Frazier. The board could rescind the demolition order to let the ladies save the church, but that wasn't the point, she explained. Frazier had known there was a chance the board would let the demolition order stand. And when it did, the ladies would lose out.

"The culprit is the minister who showed up taking your money, knowing the building was up for demolition," Swint told the crest-fallen church ladies. "He knew what

he was doing. You go back and tell everyone that the Reverend Frazier—he takes advantage of people."

The ladies argued to no avail; the board voted 6–1 to demolish the church. If the women wished to appeal the order, Gaines told them, they must pay the board a $540 appeal fee.

After getting a copy of the demolition order and weeping in the hallway, the church ladies filed out of City Hall.

Later that evening, as Gaines left the council chambers, he explained that the board had voted for demolition on "recommendations from staff." Yet city records showed the staff had actually recommended allowing the ladies to repair the church.

Today, the church is still standing, but the church ladies don't know if they'll be able to raise the appeal fee.

Gaines would later characterize the entire episode as "unfortunate."

Dallas' Urban Rehabilitation Standards Board wields enormous power. It can order your home demolished without a judge's consent, and requires no warrants for city officials to set foot on your property.

And scenes such as the church ladies' ordeal are commonplace. Citizens who find themselves dealing with any of the city agencies that play a part in Dallas' urban rehabilitation effort are often lost amid a bureaucracy that seems to have no idea where it's headed, or why. It simply rumbles on, fielding citizen complaints, responding with code-violation citations, forwarding tougher cases to the URSB, and—when board members perceive that the urban rehab machinery isn't chugging along as fast as it could—ordering a demolition.

Citizen encounters with the URSB's administrators and staff frequently result in unpleasant, and sometimes devastating, experiences.

The URSB's staff offices on the sixth floor of City Hall feature no literature defining the board's function, nor anything to explain its relationship with other city agencies engaged in the task of urban rehabilitation—such as Code Enforcement, Planning and Development, Public Works, and Streets and Sanitation. No knowledgeable staff person greets the harried citizen. Unsmiling clerks, when pressed for information, impatiently tell you they don't have it. Supervisors, who presumably *do* have the information, are rarely available to assist visitors.

Aquila Allen, the URSB's administrator, acknowledges that her office is not known for customer service. "That's something we are looking into," she says.

So without a road map—deprived of brochures, outlines, manuals, or guidelines—the citizen is left to figure it all out himself.

The system works like this: after a citizen complains to the city's Code Enforcement Department about the condition of a property, an inspector visits the site and, if the situation warrants it, issues an order for the owner to make repairs. If the owner complies quickly enough, the matter is finished.

If the owner doesn't—perhaps he lacks the money to make the repairs, or has abandoned the property—the case moves on to the Urban Rehabilitation Standards Board. During the city's 1994–'95 fiscal year, 13 percent of the 18,200 structures and properties cited for code violations ended up before the board.

The board's four panels each meet once a month at City Hall. Its members, numbering from six to eight on each panel, are

appointed by city council members to two-year terms.

At the URSB's public hearings, the great majority of properties that come up for consideration are declared urban nuisances—and the board either orders immediate compliance from the owner, or demolition. The board possesses the power to level fines of up to $1,000 a day to enforce its actions. Occasionally, it will hand over a property to a non-profit organization that agrees to fix it up.

If the board issues a demolition order, Code Enforcement staff members forward the case to Public Works, which contracts with several private demolition companies. The city charges the property owner for the demolition, and if the owner doesn't pay up, the city seizes the property.

A homeowner has only a few options if his property comes under a demolition order. He can sell it, appeal the order, or demolish the house himself. The homeowner can stop a final demolition order only by going to state district court. And if he doesn't have the money or wherewithal to get an injunction, the house will invariably get torn down.

It's no secret that URSB and Code Enforcement officials make few friends through their often-unpleasant work.

One clerk acknowledged Code Enforcement's propensity for making enemies when she commented on remodeling in the office: "It's OK," she said. "Except our backs are to the window."

Many people despise the URSB for one reason: it has the power to demolish homes. And the demolition program the board oversees is aggressive, but also flawed.

From October 1993 through September 1995, the City of Dallas demolished 1,113 structures, mostly single-family homes located in low-income areas of South Dallas, West Dallas, and Oak Cliff.

For fiscal year 1993–'94, Code Enforcement estimated that 485 Dallas homes would be demolished. But seven months into that period, the city had already demolished 534 homes. The staff noted that two of those properties, very large apartment complexes, cost the city nearly $1 million to tear down.

The number of URSB-demolished houses was much higher than city officials expected. So in February 1994, the city council approved another $750,000 to pay for more demolitions.

The city's actions are a classic example of what ails urban rehabilitation efforts in Dallas. Despite the grave need for low-income housing here and in other urban areas across the United States, the city chose not to rehabilitate these substandard homes, but simply to make them disappear. And disappear they did—mostly in minority and poor neighborhoods—with nothing to replace them.

Developer Harvey Giddens says he ran straight into Dallas' one-track strategy for urban rehab when he tried to buy some condemned properties on Dixon Avenue.

"I think more can be done with existing properties in Dallas than what is being done right now," he says. "In Los Angeles, a property could be standing and get ordered demolished ... but if someone comes in and says, 'I am going to buy this property' the City of Los Angeles is always in a position to allow them to do that. They don't tell a person to go see a lawyer, that 'this is on the demo list—try and stop it.' This is the kind of attitude I have found in Dallas."

Giddens adds, "Any developer who runs up against this kind of resistance with the city ... is apt to get frustrated. The

result is that the city is creating problems for itself."

Because of criticisms that the city was demolishing too many homes in poor minority neighborhoods, the city council issued a moratorium on demolitions of single-family owner-occupied homes in October 1994. The moratorium, however, does not apply to vacant homes or those occupied by renters. And from October 1994 through August 1995, the URSB ordered another 322 homes demolished.

In principle, the city seeks to demolish dangerous homes—urban nuisances that the owner cannot or will not repair to meet city codes. Even so, a house can have several code violations and not be considered a nuisance. Most homes in Dallas, in fact, contain at least one code violation.

If a home has visible code violations, such as a broken window pane or sagging roof, an inspector, usually acting on citizen complaints, gives the owner a notice of violation, and follows up until the house is fixed or its status forwarded to the URSB.

But in Dallas, many citizens complain that it doesn't always work that way.

On July 20, 1994, former Dallas resident Roosevelt Lampkin learned the city had bull-dozed his rental house at 2330 Britton Street in Oak Cliff.

The news came as quite a shock to Lampkin, who had retired in Milton, Florida. He had been in constant contact with city officials ever since fire damaged the house in 1992. Two rooms were burned, Lampkin says, but he could not afford to repair them as well as make the mortgage payments. So he talked to the Fire Department and Code Enforcement about what he needed to do to secure the house until he could fix it.

Officials advised him to board up the windows so people could not see inside, and keep the grass cut. Lampkin complied. He says, in fact, that he cut the grass on July 13, 1994, a week before the city demolished the house. And he had just obtained the permits needed to repair the home.

When a neighbor called with the bad news about the demolition, Lampkin was distraught. He'd invested a lot of money in the house: at 62, he planned to rent it out as a source of retirement income. Now, the house was gone.

"I just couldn't believe it," Lampkin says. "My insurance had just settled with me. I did everything the city asked of me, and now I still ain't got my house."

He called Code Enforcement, and after getting the runaround, ended up talking to a clerk in Public Works, which contracts demolitions for the URSB.

The bored clerk told Lampkin the city had indeed tried to contact him to warn him that his house was slated for demolition, but the certified letter they'd sent to the unoccupied house came back. The city moved along with the demolition anyway.

"I asked him why he would send a certified letter to a house that nobody lived in," Lampkin recalls. The clerk told him that Public Works had merely acted on information provided by Code Enforcement.

To make matters worse, Code Enforcement possessed, in its file on the house, Lampkin's home address in Florida, but never bothered to use it. Lampkin says city officials apologized to him in private, hinting they might be able to make it up to him. He filed a claim against the city earlier this year, hoping to recoup the value of the house the city had mistakenly torn down.

He'll have to stand in line.

Dozens of citizens have made claims against the city, complaining that their homes were demolished without due process.

The cases date back to 1992, when the city began pursuing its aggressive demolition program to eliminate a backlog of homes ordered demolished, but never actually destroyed.

Publicly, Code Enforcement officials and URSB members defend the city's demolition program. The program is saturated with constitutional protections, they say, for well-meaning homeowners who comply with city code. The only homes demolished in Dallas, they insist, belong to people who've ignored repeated warnings to clean up their act.

But that's not necessarily true.

One of the greatest flaws in the city's demolition program is Code Enforcement's notification process, run by inexperienced clerks using outdated records.

When the board orders a demolition, the city is required to do two things: advertise the order in a newspaper, and attempt to reach the owner by mail. In Doug Lisle's case, the city says it did both.

The house at 2511 Idaho in East Oak Cliff had been in disrepair for some time when it reached the board in 1992. The code violations were relatively minor, pertaining to problems with paint, windows, and roofing: the URSB estimated it would cost $6,000 to get the property up to code.

The house's owner, Gerald Mymbs, hadn't responded to any of the city's notices, but he wasn't paying his taxes, either. So the county seized the house and sold it at a sheriff's sale in December 1992. A Dallas psychologist, Douglas J. Lisle, bought it for the amount owed in taxes: $3,500.

"My intent was to fix it up and rent it out," Lisle says. "It was an older house and large, around 1,500 square feet. The ceilings were nine foot high, so it was really neat."

On advice from his attorney, Lisle decided to wait two years before renovating, because Texas law allows the former owner to redeem a seized property if he's able to make good on the money owed to the city or county within that time. The lawyer wasn't sure whether the law would allow Lisle to recoup his rehab money if Mymbs decided he wanted the house back.

Lisle figured the two-year wait wouldn't pose a problem, because the house was boarded up and the grass was cut.

In fall 1994, as the two-year redemption period came to a close, the psychologist went to check out the house to assess whatever work needed to be done. But there was no house.

"I thought I was on the wrong street," Lisle recalls. "I drove by again and recognized the other properties, so I knew where I was. Then I looked at the number on the curb and I thought, 'I'll be darned.'"

The city had razed the house without Lisle's knowledge. A placid, even-tempered man, Lisle wondered whether he'd done something wrong. Was he supposed to register the house with someone? He was baffled.

Then—even though the city hadn't sent a single demolition notice—it mailed, to his residence, a $2,000 bill. To make matters worse, he says, he later received a letter from city attorneys threatening to ruin his credit if he did not pay for the demolition.

That notice also went directly to Lisle's home. "I thought, 'That's lovely.'" he says.

Lisle learned that the house had been slated for demolition a month before he bought it, but neither the county nor the city informed him during or after the sheriff's sale.

Aquila Allen, the URSB's administrator, says the Code Enforcement department uses property tax records and deeds to find owners, and in Lisle's case, the city filed the demolition order with the county deed record. The buyer, she says, is obligated to search the county records himself.

Yet she later admitted the city had identified *Mymbs* as the owner of 2511 Idaho based on the deed in the house's URSB file. That deed was two years old.

(Last week, Allen told the *Observer* that Code Enforcement has now begun requesting updates on the deeds it uses if the deed information in files is more than six months old.)

Lisle filed a claim against the city, demanding reimbursement for the cost of the house and taxes he paid on it during the brief period before it was destroyed.

"If I am required to pay for demolition costs," he wrote, "my claim will be for $4,800." He added that his interest was in "the quaint, 3 bedroom, 2 bath 1,500 square foot home that used to be at 2511 Idaho Avenue. If you will reimburse me for my costs, the city may keep the lot."

In a letter to Human Resources, the department overseeing claims against the city, Code Enforcement official Elizabeth Fernandez rebutted Lisle's claim, saying the city acted "in good faith" in trying to notify him. She did not explain how the city managed to find Lisle when it came time to pay for demolition costs, but couldn't find him to let him know the property would be torn down.

Also, she noted, Code Enforcement had advertised the pending demolition in the newspaper. What she didn't say, however, is that the newspaper is the *Daily Commercial Record*—an obscure local publication with a circulation of 3,200 that can be found in boxes at some government offices and various DART Park–and–Rides.

Lisle says he no longer plans to invest in inner-city properties, despite the potential rewards. "It certainly would have been a nice addition to the neighborhood and would have provided a low-cost place to live," he says sadly. "It's just an economic waste . . . I certainly wouldn't buy another one."

Lisle's situation is not unique. The city attorney's office continues to face claims and lawsuits from citizens who charge the city has illegally demolished their homes. The *Observer* has isolated more than 20 open cases since 1992 in which citizens claim they weren't notified that the city planned demolitions.

Lopez responds that "We should look at other ways of getting out and locating the owner, making more of an effort, knocking on doors. It may lengthen the process, but we need to be doing it."

About the city's chosen vehicle for publicly warning homeowners about pending demolitions, Allen says, "It is the paper the city council has chosen for this purpose."

Poor communication among city departments plays a big role in the city's demolition disasters. But some cases are simply beyond explanation.

Take 2117 East Overton, for instance. Sixty-eight-year-old Martha Bernice Hollins had only one more year of paying her $183 monthly mortgage payment before she'd obtain title free and clear to her solid frame home. She'd been living with her ill mother in Henderson, Texas, but on a visit

home to Dallas on February 2, 1994, she discovered a code-violation tag on her garage. The free-standing garage was leaning, its wood was rotted, and it really did need to come down, she knew, so she began looking for someone to demolish it cheaply. A city inspector also called to tell her the grass was too high, so she cut it, and traveled back to Henderson.

A month later, at a URSB hearing on March 1, 1994, a board member Mattie Nash asked fellow board members to declare the *house* an urban nuisance, even though the inspector hadn't deemed it so. Photos of the house in city files revealed only one code violation: two missing shingles under a window, and about an arm's length area of water-damaged wood where the protective shingles used to be. The rest of the house was painted, secure, and sound.

Although board members are supposed to use the photos to help determine whether a home is substandard, and tour the home whenever possible, they all agreed with Nash.

Three months later, after the city sent a default notice to the unoccupied house because Hollins hadn't torn down her garage and the weeds had grown high again, Aquila Allen began making arrangements for demolition.

In the meantime, unaware of the URSB hearing, Hollins paid someone $200 to demolish her garage.

Ironically, while Allen prepared for the home's demolition, a city inspector was preparing to forward the case to Code Enforcement's mow/clean division, since the garage was already gone and the only problem remaining was high grass.

The mow/clean division cuts grass and picks up litter on unoccupied properties that have come before the board, then attaches a lien for its costs to the home's title.

But the mow/clean office never got the request. And five months later, the house was gone. Throughout the process, the city sent certified mail to a house its employees knew to be vacant, and the URSB ignored information and recommendations provided by the inspector.

Elizabeth Fernandez says the city hopes that by sending certified mail to empty homes, the owner will come by and see the notice indicating the letter is waiting at the post office.

But all that's beside the point, Hollins says. "I never had anything against my house," she points out. "All it ever was was the weeds and the garage. It was a solid, clean house. I had furniture, clothes, and everything in there. This really, really hurt me." Hollins is still paying her $183 monthly mortgage payments on the home today, even though it is no longer there.

City officials have shown great reluctance to talk about individual demolition claims. Assistant city manager Ramon Miguez, who oversees the Code Enforcement office, says he has not been made aware of any of the dozens of cases, and knows of none that has merit. City manager John Ware says Miguez has not discussed with him any problems regarding the city's notification process.

A city's rights and responsibilities for demolishing a person's home have been addressed many times in court, including a 1975 Washington, D.C. decision which stated that "A municipality, in the exercise of its police power, may, without compensation, destroy a building or structure that is a menace to the public's safety or health. However, that municipality must, before destroying a building, give the owner sufficient notice, a hearing, an ample opportu-

nity to demolish the building himself or to do what suffices to make it safe or healthy; such a procedure is the essence of the governmental responsibility to accord due process of law."

Dallas city attorney Sam Lindsay says his office is looking into some of the questions raised by the *Observer*.

"If there is something going to the board, if they are going to issue a demolition order, everybody who is in the chain of ownership needs to be notified. I mean everybody," Lindsay says. "Folks on the Urban Rehab board know that, people in the city departments know that. That is basic."

One city official, who requested anonymity, added: "We are going to be settling cases if [Code Enforcement and related departments] don't get their act together."

That remark was made several months ago. Yet even as city officials deny knowledge of the claims and defend their demolition procedures, the city has begun settling some claims for wrongful demolitions.

City records show that Code Enforcement officials have recommended that the city pay the owner of one house for personal items lost because of the "premature demolition." Fernandez blamed poor communication with Public Works for the mishap.

And in an executive session with city council members on October 18, Code Enforcement officials asked the city to settle a claim for $11,000 for the wrongful demolition of 2214 Cooper Street.

According to the city records, Code Enforcement staff had sent notices of demolition to the wrong address, even though the department had successfully contacted the owner, Daisy Trimble Brown, in the past

and had her correct address on file. (The council approved the settlement last week.)

And while some homeowners suffer from drawing the attention of the URSB, others seem to avoid the board's scrutiny almost completely.

The woman stepping out of her West Dallas house looks like the mistress of her domain. In this poor, mostly Hispanic neighborhood, she is the proud owner of a home. It's slightly bigger than the ones on her block, and has a little history to it. Bonnie and Clyde slept there, she says, although many homeowners in West Dallas make that claim.

Her house is painted, the potted plants are thriving, and the porch is decked out with charming wrought-iron furniture and cacti.

She puts work into her house, she says, because it's hers. Most of the neighbors are renters.

Their houses, renting for as little as $150 a month, are small and mean. Shotgun. Some are crumbling, some leaning. Most have visible code violations. The city has torn down better houses than these.

With few exceptions, the neighbors all rent from one family, the Wheelers. Tom Wheeler Jr., 46, manages the rental homes for his family. The neighbors talk a lot about Wheeler.

"They say he won't fix the houses up," the homeowner says. "The people across the street had to fix their own porch, 'cause he wouldn't do nothing."

"I used to rent from him myself, and the house was falling down. Me and my husband said we needed to buy our own house. When we moved out, the city knocked it down. All they had to do was blow."

Across the street, tenants point out the porch they say they replaced themselves,

after spending months trying to get the Wheelers to fix it. The commode leaks, they say. Another Wheeler house has a falling porch; another, cracked windows; another, a bad foundation. Several need painting and some have several levels of roof. There is hardly a street in this area of inner West Dallas without a Wheeler house having visible, uncited code violations.

"The majority of the properties have outlived their usefulness," says David Lewis, director of the West Dallas Development Corporation, a non-profit organization. "Most of them are marginally capable of undergoing rehabilitation."

Still, Lewis' organization is looking into buying some of the Wheeler's properties.

"They are valuable for one fundamental reason," Lewis says. "They are affordable in a way that no others are. They represent housing that, at $135 a month, cannot be replaced."

In all, Tom Wheeler manages about 400 of his family's 600 properties. A city code inspector, at the behest of the *Observer*, toured the outsides of dozens of these homes, and found the vast majority to show at least one serious code violation, from rotted wood and bad foundations to unstable porches.

As Dallas housing attorney Mike Daniel puts it: "Some of it looks like the stuff they cleared out of the Mississippi Delta 10 years ago."

Even so, Code Enforcement has been uncommonly gentle to the Wheelers in West Dallas.

Inspectors have issued only 55 violation notices on the entire stock of 400 houses in the past three years, and fined Wheeler only twice. Those numbers are surprising because about two-thirds of the Wheeler houses sit in a Walker Target area, designated as such through a housing discrimination lawsuit the city settled in 1990. The plaintiffs alleged that the city discriminated against blacks by segregating them in sub-standard public housing. As part of the Walker Consent Decree, the city was to carry out "proactive housing code enforcement" to root out code violations in certain problem neighborhoods.

In other words, inspectors were not to rely on citizen complaints to drive the enforcement process, as they generally do in other parts of town. The court required them to search for the violations themselves.

And sometimes they did. Take the case of Carlos and Dana Jackson (described in a June 1, 1995 *Observer* news story, "Can't go home again"). The young West Dallas couple has been battling city inspectors for months.

In the past six months, the city has issued 80 notices of violations on *six* properties the Jacksons have been trying to renovate, and the young couple has gone to municipal court and the URSB numerous times to fight civil penalties.

And all around them are Wheeler properties, some of which have persistent and serious code violations. But no tags signifying they've been cited.

Daniel, who represented plaintiffs in the landmark Walker discrimination case, says the inequities in code enforcement are "astounding." "The differences are inexplicable unless you take into account the differences of race and wealth between the Wheelers and the Jacksons."

What makes the situation even more curious, Daniel adds, is that the agreement requires the inspectors to concentrate on commercial and rental properties like those held by the Wheelers, not residences like the Jacksons'.

"Given the agreement," Daniel asks, "How can the Wheelers have been missed?"

The civil rights lawyer sent a letter to city attorney Sam Lindsey pointing out the inequities. "The best we have gotten to date is, 'We are looking at it,' " Daniel says.

But the request apparently has not trickled down to Code Enforcement, Ramiro Lopez says he had not heard of the Wheeler properties, but the department will investigate the matter.

"It does raise a question I think we need to look at," Lopez says. "Were cases not worked properly when they are the ones held by that individual? I hope the cases are closed because they complied. If they didn't comply, then it is very serious. We need to do a review of some of those cases."

Wheeler maintains the city has acted fairly in West Dallas and in its dealing with his family. "I can show you the fines I have paid," he says. "We don't get special treatment."

The Wheeler dynasty started in the 1940's when Tom Wheeler's 97–year–old–dad, Thomas Wheeler Sr., began renting his low-end properties to poor white folks. The junior Wheeler inherited the majority of his family's huge stock of crumbling shotgun homes. And he is the first to tell you he is a "slumlord," because that is the title he says he inherited.

Wheeler says he and his mother and sister now control about 400 properties, and his father controls the remainder. Tom Wheeler says he's trying to do better than his father. He says he's devoted to revitalizing West Dallas, and is active in a number of programs to do just that.

He is working with Vecinos Unidos, a non-profit neighborhood development group, on a project on Winnetka Avenue, helping to construct new single-family homes. Seven are already built. He has also had a hand in other developments and constantly tries to improve his own properties, he says—but not through fixing code violations.

"Over the last 10 years, we have been in the process of upgrading the property we own in the area," he says. "My part in it is that I have been upgrading our own properties in terms of the families who live there, looking for families who would take care of it."

In other words, it's the people, not the homes, who pose the problems.

"The bottom line for me is that if I make any money, it will be by upgrading the community," he says.

Wheeler has been pushing these notions for years: that urban rehab is profitable, that the neighborhood needs good renters, that revitalization is the best thing for West Dallas and himself. Yet much of his housing is still in poor shape, and some is in terrible shape. And the city evidently does not see cause for concern.

"We have always worked with the city," Wheeler says. "They have been quite reasonable in the requests that they make."

Ironically, Wheeler serves on the city's multi-family housing task force, which seeks to find ways to enforce city codes. Joe Burkleo sits on the same board, although he says he does not know Wheeler and isn't familiar with the man's hundreds of properties.

Wheeler has already asked the task force to consider lowering its fines when a landlord finally gets around to fixing code violations. But he says his membership on the task force has nothing to do with Code Enforcement's gentle treatment. Last

March, he pointed out, one of his storefronts on Westmoreland made it all the way to the URSB, and the board voted to demolish it.

Wheeler responded by offering the property to a neighborhood café owner, Willie Matthews. Matthews says he's trying to repair the building and turn it into a thrift store and marketplace, but is struggling financially. "I started some things, but I don't have enough money," he says. "That old boy [Wheeler] was supposed to help me fix it up, but I haven't heard from him. *He* has money."

Matthews has great plans for the place. "I know I can restore it and make it look like something," he says. "I just wish I could get some help. The city hasn't told me about any grants or programs. All they want to do is come here and tear up stuff."

Normally—as the church ladies found out—the URSB has the power to rescind a demolition order if the property is sold to someone who wants to fix it up.

In Matthews' case, the board rescinded the demolition. Coincidentally, the deed was still in Tom Wheeler's name. The truth is that, 12 years ago, nobody paid much attention to code enforcement. Occasionally, the city's "nuisance" inspector would come out to white areas and force a messy neighbor to clean up his yard. Code enforcement in black neighborhoods was close to non-existent.

White flight used to be the answer to what people perceived as deteriorating neighborhoods. If the neighborhood started to decline, if neighbors didn't keep up their houses, if people with undesirable complexions moved in next door, folks up and moved to the suburbs.

That was then. Now, for many low-income Dallas residents, there is no place to go. And as cities come to realize the economic importance of luring citizens and businesses back to the inner city, code enforcement has become a critical aspect of neighborhood revitalization.

Long-neglected South Dallas, West Dallas, and East Oak Cliff are now of great interest to city planners and developers. Some neighborhoods could become sites for new development if they could only be cleaned up. Code enforcement has become the tool for doing just that.

But the city was not prepared. Code Enforcement and other departments charged with urban rehabilitation couldn't adhere to any overall design or purpose, amid the aggressiveness with which the city council chose to enforce housing codes. Ramiro Lopez says the issues that beset Code Enforcement are growing pains, not unusual for an evolving discipline.

"Who ever heard of code enforcement being a viable city service 10 to 12 years ago?" he asks. "There wasn't any kind of state organization for code enforcement until the last 10 years."

In Dallas, this difficult task has been tagged on to different departments over the years. It is now a duty of the Streets and Sanitation Code Enforcement Department, having recently been moved from Housing and Neighborhood Services as part of the city's reorganization under city manager John Ware.

Officials are now touting several programs aimed at helping people in bad housing situations. And several corporations are also working to assist people stuck in sub-standard housing.

Meanwhile, Dallas' low-income housing continues to grow older, with many homes and apartments deteriorated beyond redemption. And neighbors want relief.

"The majority of the people in Dallas do want code enforcement," Lopez says.

The challenge, he concludes, is to ensure that code enforcement activity works to benefit the city—that the city carries out a thoughtful urban rehabilitation plan designed to build up, not tear down.