**Carla T. MAIN and The Encounter for Culture and Education, Inc., Appellants,**

**v.**

**H. Walker ROYALL, Appellee.**

**No. 05–09–01503–CV.**

Court of Appeals of Texas, Dallas.

July 25, 2011.

Matthew R. Miller, Wesley Hottot, Institute for Justice Texas Chapter, Austin, TX, John J. Little, Little, Pederson Frankhauser L.L.P., Megan K. Dredla, Little Pedersen Fankhauser LLP, Dallas, TX, Dana Berliner, Institute for Justice, Arlington, VA, for Appellants.

Robert B. Gilbreath, Hawkins, Parnell, Thackston & Young, LLP, Dallas, TX, Patrick Zummo, Patrick Zummo Attorney, Houston, TX, for Appellee.

Before Justices BRIDGES, RICHTER, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

This interlocutory appeal arises from a libel suit brought by appellee, H. Walker Royall, against appellants, Carla T. Main and The Encounter for Culture and Education, Inc. Appellants contend that the trial court erred when it denied their no-evidence motion for summary judgment

and traditional motion for partial summary judgment. Royall contends that we do not have jurisdiction to entertain this interlocutory appeal. We affirm in part and reverse and render in part.

## BACKGROUND

Main wrote and Encounter published BULLDOZED: "KELO," EMINENT DOMAIN, AND THE AMERICAN LUST FOR LAND, a book critical of the government's taking of private property by eminent domain to use for private development. It explores the history of eminent domain and court decisions about the government's use of the power, particularly the United States Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005).[1]

Portions of the book are set in the City of Freeport, Texas and tell the story of the City's plan to use eminent domain to condemn waterfront property along the Old Brazos River to build a private yacht marina. The story is told from the viewpoint of one of the property owners—Western Seafood Company, a shrimp processing business owned by Wright "Pappy" Gore, Sr. and his family. It chronicles the Gore family's efforts over several years to prevent the City from condemning a 330–foot strip of property belonging to Western Seafood and used in their shrimp processing business. The Gores contended that this strip of property was crucial to the livelihood of Western Seafood. The book details the City's efforts to reach an agreement with the Gores and to build the marina on land adjacent to Western Seafood that was owned by the Blaffer family;

its agreement with Royall, a commercial real estate developer,[2] to develop and operate the marina; and the many lawsuits filed over the project.

BULLDOZED was published in October 2007. When Royall learned of it, he sued appellants and others contending that the book and publicity for the book defamed and injured him in his occupation and profession. He alleged claims for libel, aiding and abetting libel, and ratifying libel, and he sought nominal, general, actual, and exemplary damages.

Main and Encounter moved for no-evidence summary judgment on Royall's claims. They also filed a traditional motion for partial summary judgment on specific issues. The trial court denied both motions. Main and Encounter filed this interlocutory appeal.

## JURISDICTION

Royall initially questions whether we have jurisdiction to hear this appeal. Section 51.014(a)(6) of the Texas Civil Practice and Remedies Code authorizes an interlocutory appeal when a trial court:

> denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73[.]

1. In *Kelo*, the Supreme Court concluded that the city's taking of property by eminent domain from one citizen and giving it to another who would improve the property and increase its value was a "public use" under the Fifth Amendment to the United States Constitution because the taking was for the benefit of the city by providing increased taxes. 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 *passim*.

2. Royall is a descendant of the Blaffer family and was a co-owner of the land on which the City proposed to build the marina.

TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (West 2008).[3] Royall contends that we do not have jurisdiction because the legislature did not intend the language of section 51.014(a)(6) to include authors and publishers of books as "member[s] of the electronic or print media," and because Main and Encounter's motions for summary judgment were not based in whole or in part on a defense arising under the First Amendment, article I, section 8 of the Texas Constitution, or Chapter 73. We disagree.

### "Member of the Electronic or Print Media"

In resolving the jurisdictional question, we first must determine whether the legislature intended the language "member of the electronic or print media" to include book authors and publishers. Section 51.014(a)(6) does not define "print media" or who is "a member of the electronic or print media." *See id.* We have not found and the parties do not cite any Texas cases that decide this issue directly.[4] As a result, it appears to be an issue of first impression.

When we construe a statute, we read the language used in the statute and construe the statute in its entirety. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000); *see In re Bay Area Citizens Against Lawsuit Abuse,* 982 S.W.2d 371, 380 (Tex.1998) (orig. proceeding); *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n,* 616 S.W.2d 187, 190 (Tex.1981).

If the language is not ambiguous, we interpret it according to its plain meaning. *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002). And if words are not defined, we use their plain and common meaning unless the context of the statute indicates a contrary intention or it leads to an absurd result. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625–26 (Tex. 2008). We presume the legislature intended a just and reasonable result when it enacted the statute. *Id.* at 626. In construing the statute, we may consider factors such as the statute's purpose; circumstances under which it was enacted; its legislative history; the common law and former versions of the statute; statutes on the same or similar subjects; and the consequences of a particular construction. TEX. GOV'T CODE ANN. § 311.023 (West 2005).

Royall argues that the legislature did not intend the statute to apply to book authors and publishers because books were an existing technology when the statute was passed, but the legislature did not include book authors and publishers in the express terms of the statute and the legislative history of the statute does not refer to book authors and publishers. He also argues that the term "media defendants" has never been broadened to include defendants beyond the "newspaper or broadcaster" category.

Royall cites *Rogers v. Cassidy,* 946 S.W.2d 439, 443 (Tex.App.-Corpus Christi

---

3. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. CONST. amend. I. Article I, section 8 of the Texas Constitution provides that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press...." TEX. CONST. art. I, § 8. "Chapter 73" refers to the

libel statute in the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. §§ 73.001–.006 (West 2005).

4. In *Harvest House Publishers v. Local Church,* 190 S.W.3d 204 (Tex.App.-Houston [1st Dist.] 2006, pet. denied), the court considered a book author's interlocutory appeal under this statute. Jurisdiction was not raised as an issue in that case. *See id.* at 209.

1997, no pet.), *overruled in part on other grounds by Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413 (Tex.2000), and *Quebe v. Pope,* 201 S.W.3d 166, 170 n. 5 (Tex.App.-Houston [14th Dist.] 2006, pet. denied), to support his contention that the statute was not intended to apply to authors and publishers of books.

In *Cassidy,* a city attorney filed a defamation lawsuit against a private citizen who accused the city attorney of improprieties in an election. *Cassidy,* 946 S.W.2d at 441. Both parties filed motions for summary judgment, which were denied, and both filed interlocutory appeals under this statute. The jurisdictional question in that case was whether the legislature intended the statute to apply to a plaintiff who claimed to have been libeled by the media. *Id.* at 443. The court concluded it did not:

> The purpose of the section is "to allow a newspaper, radio station or television station that was sued for libel to make an immediate appeal of a judge's refusal to grant a summary judgment." House Research Org., Bill Analysis, Tex. S.B. 76, 73rd Leg., R.S. (41). "Section [51.014(a)(6)] permit[s] the courts to sort out unmeritorious libel cases *before* a case enters the time-consuming and expensive trial phase."

*Id.* at 443. Although the court referred specifically to "a newspaper, radio station or television station" when describing the purpose of the statute, the issue in that case was whether *a plaintiff* could file an interlocutory appeal under the statute. Consequently, we do not agree that *Cassidy* decided the issue before us. *See id.* at 441–43.

In *Quebe,* private citizens accused a police officer of sexually assaulting a minor and the officer sued for defamation. The focus of the appeal was the meaning of "published" as used in the statute because the libel defendants' and the libel plaintiff's names were never used in the publication and the specific allegations were not stated. *Quebe,* 201 S.W.3d at 169–70. In a footnote, the court cited the statute's legislative history:

> As originally proposed, the amendatory legislation, Senate Bill 76, applied only to members of the media. Senate Comm. on State Affairs, Bill Analysis, Tex. S.B. 76, 73rd Leg., R.S. (1993). Senator Jim Turner, the bill's sponsor, offered an amendment that extended application to persons other than members of the media. In a note accompanying the amendment, Turner explained: "For example, it would cover persons who have letters or op-ed pieces published in newspapers or magazines or who express their opinions on radio or television programs." Floor Amendment No. 2 to Tex. S.B. 76, 73rd Leg., R.S. (February 25, 1993).

*Id.* at 170 n. 5. Again, as with *Cassidy,* the question of whether the statute was intended to apply to book authors and publishers was not an issue in *Quebe.*

We construe the statute understanding that the legislature's purpose in enacting section 51.014(a)(6) was to provide members of the media with a mechanism to obtain immediate appellate review when a trial court denies their motion for summary judgment and when that motion was based on a claim or defense "arising under the free speech or free press clause of the First Amendment...." TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6); *see TSM AM–FM TV v. Meca Homes, Inc.,* 969 S.W.2d 448, 451 (Tex.App.-El Paso 1998, pet. denied) (citing legislative history); *Grant v. Wood,* 916 S.W.2d 42, 46 (Tex. App.-Houston [1st Dist.] 1995, orig. proceeding). Allowing members of the electronic and print media to file an immediate appeal of issues arising under the free speech or free press clause avoids the time and expense of a trial when the defendant

may be entitled to a constitutional or statutory privilege precluding liability. *Meca Homes,* 969 S.W.2d at 451; *Grant,* 916 S.W.2d at 46.

■ Although section 51.014(a)(6) does not refer specifically to book authors and publishers, it also does not refer specifically to newspapers, radio and television stations, or internet publications. But the statute has been interpreted to apply to these types of media. *See, e.g., Klentzman v. Brady,* 312 S.W.3d 886, 891 (Tex.App.-Houston [1st Dist.] 2009, no pet.) (applying interlocutory appeal statute to newspaper); *Kaufman v. Islamic Soc. of Arlington,* 291 S.W.3d 130, 133 (Tex.App.-Fort Worth 2009, pet. denied) (internet article); *Fox Entm't Group, Inc. v. Abdel–Hafiz,* 240 S.W.3d 524, 529 (Tex.App.-Fort Worth 2007, pet. denied) (television station); *Meca Homes,* 969 S.W.2d at 448 (television and radio stations). And case law shows that the "press" has been interpreted to include book authors and publishers. *See, e.g., Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 496, 501, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (applying First Amendment standards of review in appeal of libel action by book author and publisher); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (stating "[t]he constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication"); *Doubleday & Co. v. Rogers,* 674 S.W.2d 751, 752–57 (Tex.1984) (applying First Amendment standards to appeal of defamation action by author and publisher of book). For purposes of this statute, we see no meaningful distinction between book authors and publishers and other forms of media. And we conclude that interpreting the statute as Royall asks us to do would cause an inconsistent application of the statute and lead to an absurd result. *Hughes,* 246 S.W.3d at 627.

Royall also contends that if we construe Main and Encounter to be "member[s] of the electronic or print media," then anyone with a computer, typewriter, or printer will also fall into this category and have the right to file an interlocutory appeal. He contends that only people using "a pen and pencil to handwrite his statements" would fall outside the statute's meaning. But our decision is limited to authors and publishers of traditional books because that is the issue in this case. We do not decide, and our opinion should not be interpreted to decide, as appellee argues, whether "anyone with a computer, typewriter, or printer" would qualify as a "member of the electronic or print media." *See Kaufman,* 291 S.W.3d at 142 (explaining factors used to consider whether author of internet article qualified as a "member of the electronic or print media").

In summary, we conclude that the legislature intended section 54.014(a)(6) to include authors and publishers of traditional books as "member[s] of the electronic or print media" and that Main and Encounter are "member[s] of the electronic and print media." [5]

### Defenses Arising Under First Amendment or Chapter 73

Royall also contends that even if Main and Encounter are "member[s] of the . . .

---

5. Our conclusion is supported by a statute recently enacted by the legislature granting a privilege to certain witnesses against disclosing information about their sources. *See* Tex. Civ. Prac. & Rem.Code Ann. § 22.021(3) (West Supp. 2010); *Kaufman,* 291 S.W.3d at 142. It defines "news medium" to mean "a newspaper, magazine or periodical, **book publisher** . . . that disseminates news or information to the public by any means, including: (A) print; . . . ." Tex. Civ. Prac. & Rem.Code Ann. § 22.021(3) (emphasis added); *Kaufman,* 291 S.W.3d at 142. And it defines "journalist" to mean "a person, . . . who for a substantial

print media," their defenses do not arise under the First Amendment, the Texas Constitution, or Chapter 73. We disagree. Main and Encounter answered Royall's defamation lawsuit by asserting the First Amendment and Chapter 73 as defenses, and they relied on those defenses in their motions for summary judgment. Consequently, we conclude that the motions are "based in whole or in part upon a ... defense ... arising under the free speech or free press clause of the First Amendment ... or Chapter 73" and that we have jurisdiction to entertain this interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 54.014(a)(6).

## ISSUES ON APPEAL

Appellants raise three issues which relate to the merits of the no-evidence motion for summary judgment: whether Royall presented more than a scintilla of evidence on each element of his defamation claims (issue four); whether the trial court erred by overruling Main and Encounter's objections to Royall's summary judgment evidence (issue five); and whether Royall presented more than a scintilla of evidence that Main and Encounter aided, abetted, and ratified another's defamation (issue six). *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004) (stating that court should address no-evidence motion for summary judgment before considering traditional motion).

## OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

We consider Main and Encounter's fifth issue first because it could impact our

analysis of the trial court's ruling on the summary judgment motions. Main and Encounter objected to the admissibility of deposition excerpts that Royall submitted in response to their motions on the ground that the depositions were taken in a different proceeding and were inadmissible hearsay. Royall argued that the depositions were reliable and that Main and Encounter waived any error by not objecting when he offered the same excerpts in response to their earlier motion for summary judgment. The trial court overruled the objections, ruling that the depositions were reliable and that Main and Encounter waived their objections.

■ We review a trial court's evidentiary rulings for an abuse of discretion. *Carbonara v. Tex. Stadium Corp.*, 244 S.W.3d 651, 655 (Tex.App.-Dallas 2008, no pet.). To reverse a judgment on the ground of improperly admitted evidence, a party must show that the error probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a); *Carbonara*, 244 S.W.3d at 655. To do this, the complaining party typically must demonstrate that the judgment turns on the particular evidence admitted or excluded. *Finger v. Ray*, 326 S.W.3d 285, 290 (Tex.App.-Houston [1st Dist.] 2010, no pet.).

Main and Encounter do not argue that the order denying summary judgment turned on this particular evidence or otherwise explain how the admission of this evidence probably resulted in an improper judgment. *See* TEX.R.APP. P. 44.1(a); *Ray*, 326 S.W.3d at 290; *Carbonara*, 244 S.W.3d at 655. Consequently, we conclude that they have not shown reversible error on appeal.

We resolve issue five against appellants.

portion of the person's livelihood or for substantial financial gain, ... writes ... news or information that is disseminated by a news

medium...." TEX CIV. PRAC. & REM.CODE ANN § 22.021(2).

## No-Evidence Motion for Summary Judgment

In issue four, Main and Encounter argue that the trial court erred by denying their no-evidence motion for summary judgment because Royall did not present more than a scintilla of evidence on each element of his defamation claims.

### Standard of Review

We conduct a de novo review of a trial court's decision to grant or deny a no-evidence motion for summary judgment. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156–57 (Tex.2004). After an adequate time for discovery, the party without the burden of proof may move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim. Tex.R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.* The burden then shifts to the nonmovant to produce more than a scintilla of summary judgment evidence that raises a genuine issue of material fact as to each essential element identified in the motion. *Id.* & cmt. (1997); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002). More than a scintilla of evidence exists if the evidence would allow reasonable and fair-minded people to reach the verdict under review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex.2003). Less than a scintilla of evidence exists when the evidence is so weak that it does no more than create a mere surmise or suspicion of a fact. *Forbes*, 124 S.W.3d at 172. We must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827.

To determine whether the nonmovant met its burden, we review the summary judgment evidence in the light most favorable to the nonmovant, "indulging every reasonable inference and resolving any doubts against the motion." *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex.2006) (per curiam) (quoting *City of Keller*, 168 S.W.3d at 823). We consider all the grounds for summary judgment ruled on by the trial court and that are necessary for final disposition of the appeal. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996).

### Applicable Law—Defamation

■ A statement is defamatory if it "tends to ... injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation. ..." Tex. Civ. Prac. & Rem.Code Ann. § 73.001 (West 2005); *Wheeler v. New Times, Inc.*, 49 S.W.3d 471, 474 (Tex.App.-Dallas 2001, no pet.). To maintain a defamation action, a plaintiff must prove that the defendant (1) published a statement of fact; (2) that was defamatory concerning the plaintiff; (3) while acting with actual malice regarding the truth of the statement if the plaintiff was a public official or public figure, or while acting with negligence regarding the truth of the statement if the plaintiff was a private individual. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998). To be actionable, a statement must assert an objectively verifiable fact. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Bentley v. Bunton*, 94 S.W.3d 561, 580 (Tex.2002). Whether a publication is an actionable statement of fact or a constitutionally protected opinion is a question of law. *Bentley*, 94 S.W.3d at 580. If we determine that the statements are not capable of a defamatory meaning,

we need not consider whether the complained-of statements are false or not substantially true. *Huckabee,* 19 S.W.3d at 429; *Wheeler,* 49 S.W.3d at 474.

■ Additionally, defamatory statements are either defamatory per se or defamatory per quod. *Sw. Bell Yellow Pages, Inc. v. Thomas,* No. 05–04–01722–CV, 2006 WL 217665, at *2 (Tex.App.-Dallas Jan. 30, 2006, no pet.) (mem. op.). A written defamatory statement is libel per se if the words in and of themselves are so obviously hurtful to the person aggrieved by them that they require no proof of injury. *Id.* These include statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, or (2) are falsehoods that injure one in his office, business, profession, or occupation. *Id.* If the court must resort to innuendo or extrinsic evidence to determine that the statement was defamatory, then it is libel per quod and requires proof of injury and damages. *See id.; Bingham v. Sw. Bell Yellow Pages, Inc.,* No. 2–06–229–CV, 2008 WL 163551, at *3–5 (Tex. App.-Fort Worth Jan. 17, 2008, no pet.) (mem. op.); *Moore v. Waldrop,* 166 S.W.3d 380, 384 (Tex.App.-Waco 2005, no pet.).

■ We construe an allegedly defamatory publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000); *Wheeler,* 49 S.W.3d at 474. A "person of ordinary intelligence" is one who "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 157 (Tex.2004).

## Discussion

Prior to moving for summary judgment, Main and Encounter sent interrogatories to Royall asking him to identify each state-ment in Bulldozed that he alleged to be defamatory concerning him. We quote his answers:

- The gist of the book regarding Mr. Royall and Freeport Waterfront Properties, L.P. is that the partnership was formed for the purpose of, and in anticipation of[,] developing the Freeport marina by taking property from the Gores and putting Western Seafood out of business. These statements are false and defamatory.

- Mr. Epstein's dust jacket comment defames Plaintiff by describing him as involved in "the machinations of an unholy alliance between city politicians and avaricious developers." This is libel *per se.* By adopting it as one of only three dust jacket references, Main and Encounter have joined in this *per se* libel and have adopted it as a summary of their book.

- The book makes numerous similar defamatory statements about Plaintiff. The title of the book itself accuses Plaintiff of having and acting upon a "lust for land." It repeats this on page 103. The book maintains a steady theme accusing Plaintiff, directly, by association and by innuendo, of being greedy. These statements are false and defamatory.

- The book states that Plaintiff and others attempted to "steal" land belonging to the Gores. (See p. 7, 11, 15, 18, 35, 237 and 251.) Accusing a person of planning or joining in the commission of a crime is libelous *per se.*

- The book states, directly and by insinuation and innuendo, that Plaintiff initiated the plan for the Freeport Marina. While there are occasional statements reflecting the truth, that the City of Freeport approached Plaintiff and asked him to become in-

volved in the marina project, many of these statements are written in a tone of sarcasm [ ]or skepticism. (See pp. 3, 5, 30–31, 34, 42, 57, 74 and 253.) The gist of the book is that Plaintiff and Freeport Waterfront Properties, L.P. initiated the marina project and enlisted the City of Freeport to use its powers of eminent domain for the development's private gain. Offering the Freeport marina as a current example of uses of eminent domain in reported cases, including *Kelo v. New London, Berman v. Parker* and the Poletown narrative, the book accuses Plaintiff and Freeport Waterfront Properties, L.P. of acting in the same manner that the private entities did in those cases. These statements are false and defamatory.

- The book further states that the tract in question, that defendants state Plaintiff attempted to "steal" out of his "lust for land," was the property of Wright W. Gore, Sr., and land owned by the Gore family for over 50 years. (See pp. 18, 69 and 72–74.) Wright W. "Pappy" Gore, Sr. never owned the 330 foot tract originally proposed to be included in the marina. That tract had not been owned by any Gore-related interest until it was purchased by one of the Gores' many companies or partnerships in 1993. These statements are false and defamatory.

- By misrepresenting Plaintiff's relationship with Sun Resorts, the book is intended to create the impression that Plaintiff used the marina project to benefit a company that he was associated with. (See pp. 21 and 33.) Plaintiff is not, and has never been a director of Sun Resorts. He agreed to be on the Company's "Advisory Board" only after Sun Resorts agreed to assist in the marina project. These statements are false and defamatory.

- The book's misrepresentations about the agreements between the Economic Development Corporation and Freeport Waterfront Properties, L.P. are also false and contrary to the contracts that Main claims to have the legal experience to interpret. (See pp. 3–4, 38, 59–62, 71, 100–101, 212–213 and 269.) This defames all of the participants by describing as a "sweetheart deal" and being "in cahoots" what is a standard economic development project.

- The book also falsely states that the marina project was not open to competition. (P. 42.) These statements are false and defamatory. The City attempted to enlist an earlier private developer before ever approaching Freeport Waterfront Properties, L.P., and this developer chose not to pursue the project.

- The book describes the marina project as a threat to Western Seafood and the livelihood of the Gores. This is false. (See pp. 3–7, 15, 18, 27, 30, 35, 40–41, 44–47, 56, 67, 69, 72–74, 81, 88, 91–92, 171, 173, 196, 200, 237–238, 242, 244–245 and 251.) The Gores and Western Seafood own far more than 330 feet of Old Brazos River frontage. Shrimp boats do not dock and unload at the 330 feet of river front land which the City of Freeport sought to include in the original marina plans. These statements are false and defamatory.

- The book's statements that the proposed marina would have endangered navigation are equally false. (See pp. 31, 37, 48–49, 53 and 101.) Had that land become part of the marina project, even as projected in the original conceptual plans, Western Seafood would not have lost any access to the river, and shrimp boats would still

have been able to dock and unload at the existing Western Seafood facilities. These statements are false and defamatory.

### The Motion

Main and Encounter asserted 83 grounds in their no-evidence motion for summary judgment, 79 of which related to Royall's claims that the gist of the book defamed him or that individual statements in or about the book defamed him. Those 79 grounds addressed every page of the book that Royall identified in his response to interrogatories as a basis for his defamation claims. For each of those 79 grounds, Main and Encounter asserted that, as to each identified page, Royall had no evidence that any of the statements on that page contained (1) a verifiable statement of fact, (2) capable of conveying a defamatory meaning, (3) concerning him, (4) that is false. The remaining 4 of the 83 grounds asserted that Royall had no evidence Main and Encounter aided, abetted, and ratified others' defamatory statements concerning him; that Royall had no evidence he was not a limited-purpose public figure; and that Royall had no evidence of any extrinsic fact to prove the statements are defamatory.

### Royall's Response

Main and Encounter moved for no-evidence summary judgment on each of the four elements of a defamation claim for each of the 79 grounds relating to statements in the book. To overcome the motion and to satisfy his burden, Royall had to produce more than a scintilla of evidence raising a genuine issue of material fact on each of the four elements for each of the 79 grounds. *See* TEX.R. CIV. P. 166a(i) & cmt. (1997); *Grant,* 73 S.W.3d at 215; *Kaye/Bassman Int'l Corp. v. Help Desk Now, Inc.,* 321 S.W.3d 806, 812 (Tex. App.-Dallas 2010, pet. denied).

Royall filed a combined response to Main and Encounter's no-evidence and traditional motions for summary judgment and attached over 600 pages of documents to his response. These documents included press releases and other publicity about the book, excerpts from depositions, letters and other documents about the marina project, and affidavits. He argued that his lawsuit pertained only to the "Freeport-related events in BULLDOZED," which he defined as:

> [T]he portions of BULLDOZED concerning Plaintiff, the proposed marina project in Freeport, Texas, Western Seafood Company and/or any member of the Gore family. Plaintiff specifically restricts the term "Freeport-related events in BULLDOZED" to the following portions of the book:
>
> The Introduction (pp. 1–11)
>
> Chapters 1, 2, 3, and 4 (pp. 13–102)
>
> Part of Chapter 7 (pp. 153–154)
>
> Part of Chapter 8 (pp. 171–174, 184–190)
>
> Chapter 9 (pp. 195–220)
>
> Part of Chapter 10 (pp. 221–224, 233–235)
>
> Chapter 11 (pp. 237–265)
>
> The Epilogue (pp. 267–276)

Royall excluded the portions of the book dealing with the general history of eminent domain and the discussion of the Supreme Court cases about eminent domain. But he did not respond to the specific grounds in the no-evidence motion for summary judgment. And he did not address each element of a defamation claim with regard to each of the 79 grounds. Instead, Royall addressed one ground (relating to his gist claim) separately and addressed the other 78 grounds together within categories he

established.[6] Within those categories, Royall referred to specific grounds from the no-evidence motion for summary judgment, but he did not connect any particular statement from the book to any specific ground in the motion. And he at times cited multiple pages of summary judgment evidence without directing the trial court to the specific evidence that supported his argument.

To the extent we are able to discern the arguments, we address them below. We begin with ground 74 in the no-evidence motion for summary judgment, which relates to Royall's allegation that the gist of the book defamed him. Then we will address the remaining 78 grounds relating to statements in or about the book.[7]

### The Gist of the Book [8]

Royall alleged that both the gist of the book as a whole and the gist of individual portions of the book defamed him by implying

that he formed a partnership for the purpose of, and in anticipation of developing a marina in Freeport, Texas by

taking property from the owners of Western Seafood Company and putting Western Seafood out of business.

Main and Encounter contend that Royall did not raise a proper gist claim.

 When a plaintiff alleges that the gist of a publication defamed him, we construe the allegedly defamatory publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it. *Wheeler*, 49 S.W.3d at 474. Texas law recognizes that a publication may be entirely true in its details yet still "convey a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing true facts." *Turner*, 38 S.W.3d at 115; *Wheeler*, 49 S.W.3d at 476. When a publication "gets the details right but fails to put them in the proper context and therefore gets the story's 'gist' wrong," Texas law permits liability for defamation. *Turner*, 38 S.W.3d at 115. Conversely, Texas law precludes liability for a publication that gets the story's "gist" cor-

---

**6.** In his response, Royall argued that the no-evidence motion for summary judgment "takes individual pages, and specific parts of the book's cover and dust jacket, and makes the blanket assertion that there is no evidence of the same four elements." He contended that Main and Encounter "have clearly chosen not to think seriously about their own book" because the statements he identified as defamatory "involve multiple pages; many others require related pages for context." He argued that the motion did "not fairly or clearly present the issues or elements," but stated that he would respond, despite his objection to the motion, by grouping the grounds "by subject matter...." Main and Encounter argue that we must review each statement individually. Although Royall argued in his response and in his appellate briefing that we must consider the statements in context, in oral argument he also stated that we must review each statement separately. However, because Royall's response and appellate brief did not address each statement

separately but, instead, by subject matter, we will review the statements separately to the extent possible and, if not, by subject matter.

**7.** Royall argues that Main and Encounter judicially admitted, in a previous motion for summary judgment, that a majority of the statements were "factual in nature." We reviewed the record that Royall cites, but were unable to locate where Main and Encounter stated that certain statements were "factual in nature" except in a heading in the pleading. The substance of the argument under that heading does not support Royall's contention. Consequently, we do not conclude that these are judicial admissions to which they are bound.

**8.** "Gist" means the "essence" or "main point or material part." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 959 (1981). Royall cites other publications to support his gist claim, but we consider only the book itself in determining whether its gist defamed him.

rect, but errs in the details. *Id.; Wheeler*, 49 S.W.3d at 476. With a few exceptions, Royall does not contend that BULLDOZED misled readers by omitting facts or taking them out of context and, as a result, got the gist of the story wrong. Instead, he contends that the allegedly defamatory statements about the marina project, i.e., the details, are false. *See Wheeler*, 49 S.W.3d at 476.

But even if Royall had raised a proper gist claim, we nevertheless conclude that the gist of BULLDOZED is not about him. Portions of the book tell of the Gores' fight against the City to prevent the City from taking Western Seafood's waterfront property to build a private yacht marina. Other portions of the book focus on other examples of the government's use of eminent domain, describe the history of eminent domain, and explain court decisions relating to eminent domain. The portions of the book about the marina project are obviously written from the Gores' perspective and are critical of government generally and the City in particular. Portions of the book also concern Royall and his involvement in the marina project. But a person of ordinary intelligence would not read the entire book, or even the portions about the marina controversy, and conclude that the gist was that Royall "formed a partnership for the purpose of, and in anticipation of developing a marina in Freeport, Texas by taking property from the owners of Western Seafood Company and putting Western Seafood out of business."

Royall cites *Brock v. Tandy*, No. 2–08–400–CV, 2009 WL 1905130 (Tex.App.-Fort Worth July 2, 2009, pet. denied) (mem. op. on reh'g), in which our sister court concluded that the gist of an advertisement was defamatory, and argues that the gist of BULLDOZED is "virtually identical" to the gist of the advertisement in that case. We disagree.

In *Brock*, a public official sued a landowner for defamation over an advertisement in a newspaper. *Id.* at *1. In the ad, the landowner accused the public official of recording a fraudulent document, of voting to "steal [the landowner's land] the old-fashioned way—eminent domain," and of ruining the landowner's "pasture by condemning a strip of land through the middle of [his] property. . . ." *Id.* at *1–2. Viewing the ad as a whole, the court concluded that "[a] reasonable person could view the Ad as appearing to impeach [the public official]'s honesty or reputation and to expose her to public hatred, contempt, or ridicule." *Id.* at *4. The court concluded that the "publication as a whole, as well as at least one of its individual statements," was capable of a defamatory meaning. *Id.* The individual statement that the court cited in reaching its conclusion was the statement accusing the public official of filing a false document. *Id.* at *4 & n. 8. Consequently, *Brock* is not persuasive.

■ We conclude that the trial court erred by denying the no-evidence motion for summary judgment with respect to ground 74.

The remaining 78 grounds concerned statements in or about the book that Royall contended defamed him. He responded to the no-evidence motion for summary judgment by addressing the "concerning" element of a defamation claim first.

### Evidence that Statements are Concerning Royall

■ For a statement to be actionable as defamation, it must refer to an ascertainable person. *Robertson v. Sw. Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 902 (Tex.App.-Dallas 2006, no pet.); *Double Diamond, Inc. v. Van Tyne*, 109

S.W.3d 848, 854 (Tex.App.-Dallas 2003, no pet.). The statement must "point to the plaintiff and to no one else." *Newspapers, Inc. v. Matthews,* 161 Tex. 284, 339 S.W.2d 890, 894 (1960). A statement does not have to refer to the plaintiff by name, however, if people who know and are acquainted with the plaintiff reasonably understand from reading the statement that it referred to the plaintiff. *Id.; Cox Tex. Newspapers, L.P. v. Penick,* 219 S.W.3d 425, 433 (Tex.App.-Austin 2007, pet. denied); *Robertson,* 190 S.W.3d at 902.

■ Royall's response was that 26 of the 78 grounds referred to pages in the book that "expressly mention" him by name. He asked the trial court to compare grounds 1, 3, 11, 12, 14, 15, 16, 17, 18, 20, 23, 32, 33, 34, 35, 36, 42, 44, 49, 50, 51, 56, 57, 58, 65, and 68 to specific pages in the book and argued that "[a] statement that names the plaintiff is 'of and concerning' him." He did not identify any specific statements on those pages. However, we have reviewed the pages that relate to those 26 grounds that Royall specifically identified in his response and agree that they contain statements that mention him by name. As a result, we conclude that, with regard to those 26 grounds, Royall produced more than a scintilla of evidence that statements on the pages relating to those grounds are concerning him.

With regard to the other 52 grounds (grounds 2, 4, 5, 6, 7, 8, 9, 10, 13, 19, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, 38, 39, 40, 41, 43, 45, 46, 47, 48, 52, 53, 54, 55, 59, 60, 61, 62, 63, 64, 66, 67, 69, 70, 71, 72, 73, 75, 76, 77, 78, and 79), Royall quoted statements from the cover of the book, appellants' websites, and press releases, but he did not connect any specific statement to any specific ground in the motion. He also attached the affidavit of Lee Cameron, the director of the Freeport Economic Development Corporation, who testified that he

read the book and that "the parts of the book that involve Freeport clearly refer to Walker Royall." Cameron also generally testified that statements about the idea for the marina project, the use of eminent domain for the project, the claimed effect on Western Seafood, and other statements about the marina project "were all clearly, in my reading of the book, directed at Walker Royall and his involvement." But Royall did not connect any of those statements or evidence to any specific ground raised in the motion. And he did not argue that those individual statements were concerning him, only that "defendants' own descriptions of BULLDOZED show that [*the book*] was directed at" him. (emphasis added). Consequently, we conclude that, with regard to those 52 grounds, Royall did not carry his burden to produce more than a scintilla of evidence that any of the statements relating to those grounds were concerning him. *See* TEX.R. CIV. P. 166a(i); *Grant,* 73 S.W.3d at 215; *Milo v. Martin,* 311 S.W.3d 210, 213 (Tex.App.-Beaumont 2010, no pet.). We conclude that the trial court erred by denying the no-evidence motion for summary judgment with respect to grounds 2, 4, 5, 6, 7, 8, 9, 10, 13, 19, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, 38, 39, 40, 41, 43, 45, 46, 47, 48, 52, 53, 54, 55, 59, 60, 61, 62, 63, 64, 66, 67, 69, 70, 71, 72, 73, 75, 76, 77, 78, and 79. However, to the extent Royall raised any additional arguments in response to those 52 grounds elsewhere in his response to the motion, we will also consider them elsewhere in our analysis.

### Evidence of Other Elements of Defamation Claim

We may eliminate ground 68 because Royall's response did not address that ground with regard to any element of a defamation claim other than the element that the statement was concerning him. Consequently, we conclude that the trial

court erred by denying the no-evidence motion for summary judgment with respect to ground 68.

As we stated previously, Royall did not respond to each ground separately (except for ground 74), and, instead, grouped the no-evidence grounds and his response into categories, which he labeled as: " 'Lust for Land, 'Avaricious' and 'Unholy Alliance' "; "Stealing"; "The Genesis of the Marina Project"; "The 'Sweetheart Deal' "; and "Threats to the Existence of Western Seafood." We will address the remaining grounds of the motion in the same way that Royall addressed them in his response.

**" 'Lust for Land,' 'Avaricious' and 'Unholy Alliance' "**

Royall's response grouped grounds 52, 71, 72, 75, 76, and 77 into a category of statements that he alleged accused him of being motivated by a lust for land. We previously concluded that Royall did not produce any evidence that any of the statements on the pages relating to those grounds were concerning him. Additionally, Royall identified only one statement—a commentary on the book's dust jacket that did not mention Royall by name—but did not tie it to a specific ground within this category:

> Like a Greek tragedy unfolding, Carla Main's book chronicles the eminent domain struggles in Freeport, Texas, which pitted the Gore family, with its longtime shrimp business, against the machinations of an unholy alliance between city politicians and avaricious developers. If you have ever shared the Supreme Court's unquestioned deference to the public planning process that shaped its ill-fated *Kelo* decision, you'll surely change your mind as you follow this sordid saga to its bitter end. You'll never look at eminent domain in the same way again.

—Richard A. Epstein, Professor of Law, University of Chicago; Senior Fellow, Hoover Institution; and author of *Takings: Private Property and the Power of Eminent Domain*

Because the statement did not mention Royall by name, his burden required him to produce more than a scintilla of evidence that the statement was concerning him. But he did not cite any summary judgment evidence relating to any element of his defamation claim for this statement. And he did not assert or explain how he raised a genuine issue of material fact with regard to the six grounds under this category. Consequently, we conclude that the trial court erred by denying the no-evidence motion for summary judgment with respect to grounds 52, 71, 72, 75, 76, and 77.

**"Stealing"**

Under this category, Royall did not tie his response to the specific grounds in the motion or explain how his response established the existence of a genuine issue of material fact on each element of each ground raised in the motion. He grouped certain grounds, here grounds 5, 9, 10, 11, 40, 55, 59, 60, 64, and 79, contending that they related to "defendants' accusation that [he] was attempting to steal land by using eminent domain," but he did not connect the statements in his response to those grounds. And with respect to nine of those ten grounds (all but ground 11), we previously concluded that Royall failed to produce more than a scintilla of evidence that the statements were concerning him.

Ground 11 referred to page 18 of the book. Because the following statement is found on page 18 of the book and is one of the statements that Royall quoted in his response, we presume the statement corresponds to ground 11:

Sarah Campbell Blaffer's great-grandson H. Walker Royall was slated to be the developer of the Freeport marina project, for which the City of Freeport wanted to take Pappy Gore's property.

This statement does not accuse Royall of theft as he contends. On appeal, he generally claims, without explanation, that there was summary judgment evidence to raise a fact issue. But he did not cite that evidence in his response to the motion for summary judgment. And he did not otherwise explain or argue how he raised a genuine issue of material fact about whether this statement defamed him.

We conclude that Royall did not produce more than a scintilla of evidence raising a genuine issue of material fact that any statement relating to the grounds argued under this category is capable of a defamatory meaning concerning him. We further conclude that the trial court erred by denying the no-evidence motion for summary judgment with respect to grounds 5, 9, 10, 11, 40, 55, 59, 60, 64, and 79.

**"Genesis of the Marina Project"**

Royall grouped nine grounds (grounds 1, 2, 3, 14, 15, 17, 32, 44, and 65) into a category he labeled as accusing him of conceiving and initiating the marina project. He argued that statements on pages relating to those grounds are false because he did not initiate the marina project. He also argued that, to the extent the book correctly states that the City approached him about the marina project, it states it in a tone of sarcasm or skepticism. He quoted nine statements from the book. Of those nine, we previously concluded that Royall did not produce more than a scintilla of evidence that four of them (grounds 2, 3, 17, and 32) were concerning him. The other five mention him by name:

Walker has agreed to the proposition put to him by the town—at least that's how people on the city council tell it.

That is to say, Walker did not seek out this deal. No, no, no.

. . .

He seemed to be calling on behalf of H. Walker Royall, which was odd, because Lee worked for the city and Walker was a private citizen. "Walker wants to buy this property," he said.

. . .

But what particularly worried Wright Jr. was Lee's entreaties to buy the Western Seafood property for Walker, despite his refusals.

. . .

One gets the impression that it was simply a case of noblesse oblige. The city called upon Walker, he answered the call. And what a fuss and bother afterward!

. . .

They were rebutting the position of the Gore family that the whole marina idea was dreamed up by Walker. To the contrary, they insisted it was the city's idea and believed the city should get the credit for it.

Royall argued in his response to the motion that these statements implied that he initiated the marina project and that they are false. He also cited summary judgment evidence in which City officials stated that the City talked to other developers about the marina project before approaching Royall. But Royall did not argue or cite summary judgment evidence that the statements were capable of a defamatory meaning, which is an element of a defamation claim and one of the bases on which Main and Encounter moved for no-evidence summary judgment. We conclude that a person of ordinary intelligence would not perceive the statements about who initiated the marina project as defamatory per se, and Royall did not produce any evidence that the statements are de-

famatory per quod. Consequently, we conclude that the trial court erred by denying the no-evidence motion for summary judgment with respect to grounds 1, 2, 3, 14, 15, 17, 32, 44, and 65.

**"Sweetheart Deal"**

Royall grouped 14 grounds (grounds 1, 2, 12, 16, 20, 23, 33, 34, 35, 36, 41, 50, 57, and 58) into a category he labeled as the "sweetheart deal." Under this category, he alleged that the book defamed him by making it appear that he got involved in the marina project to benefit a company on whose advisory board he served. He argued that he did not become an advisory board member of the resort development company until after the company became involved in the project. He quoted the following statements from the book to support his response:

> He runs an investment company in Dallas and serves on the advisory board of a company called Sun Resorts, which operates commercial marinas in the Texas Gulf region and the Caribbean.
>
> . . .
>
> Walker sits on the advisory board of Sun Resorts, a well-known marina management company on the Gulf Coast.

These statements do not indicate one way or the other whether Royall was already on the advisory board of Sun Resorts when Sun Resorts got involved in the marina project. And Royall does not explain how he raised a genuine issue of material fact on each element of his defamation claim with regard to the statements.

Royall also alleged under this category that the book defamed him by making the accusation that the marina project was not open to competition and that he and the City had made a "sweetheart deal." But Royall did not cite any summary judgment evidence or quote any statement from the book that used the term "sweetheart deal." He quoted only the following statements:

> The newspaper had another wild idea: competitive bidding, at least for some of the project.
>
> There is nothing in the public record to suggest that the city ever considered any other builder, much less opening up the process to competitive bidding.

And we previously concluded that Royall did not produce more than a scintilla of evidence that these statements were concerning him.

 Royall also argued generally that the book repeatedly misrepresented the terms of the agreement, repeatedly assured the readers that Main had thoroughly researched and investigated the issues, and invoked knowledge of facts that were incorrect and incomplete. He generally cited summary judgment evidence—consisting of four exhibits and over 120 pages—attached to Main and Encounter's traditional motion, but he did not cite to any specific page or provision in those exhibits, and he did not cite to his own summary judgment evidence to support his argument. *See Hadlock v. Tex. Christian Univ.*, No. 2–07–290–CV, 2009 WL 485669, at *2 (Tex.App.-Fort Worth Feb. 26, 2009, pet. denied) (mem. op.) (stating that court not required to search for evidence to support party's argument); *Burns v. Canales*, No. 14–04–00786–CV, 2006 WL 461518, at *6 (Tex.App.-Houston [14th Dist.] Feb. 28, 2006, pet. denied) (mem. op.). He stated that the "facts" in the book about the agreement were "both incorrect and incomplete," but he did not cite to specific summary judgment evidence supporting this argument. He also did not challenge any specific terms of the agreement as expressed in the book other than to contend generally that they are "incorrect and incomplete."

We conclude that Royall did not raise a genuine issue of material fact on grounds 1, 2, 12, 16, 20, 23, 33, 34, 35, 36, 41, 50, 57, and 58 and that the trial court erred by denying the no-evidence motion for summary judgment on those grounds.

**"Threats to the Existence of Western Seafood"**

Royall alleged that the book described the marina project as a threat to Western Seafood's existence and the Gore family's livelihood and as an endangerment to the navigation of the Old Brazos River. His response grouped 42 grounds under this category (grounds 1, 2, 3, 4, 5, 6, 7, 10, 13, 14, 18, 19, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 39, 40, 42, 43, 44, 45, 46, 47, 48, 49, 51, 53, 54, 56, 59, 60, 61, 62, 63, and 64). Although Royall quoted 52 statements from the book in his response to those grounds, he did not connect any of those statements to any specific element or any particular ground in the motion. And with respect to all of the grounds except ground 42, we previously concluded that Royall did not produce evidence that the statements relating to those grounds were concerning him.

Ground 42 of the no-evidence motion referred to page 72 of the book. The following statement appears on page 72 of the book; consequently, we presume this quote was intended to identify the statement Royall claimed was defamatory on page 72 of the book:

> There was no doubt that Walker had become the object of Wright III's deepest anger, the personification of the calamity that had befallen his family. The idea that someone born into the upper echelons of America's class structure should benefit from an eminent domain deal involving the taking of Pappy's business was too much for him. And for Wright, it was always *Pappy's* business.

This quote reflects Wright Gore III's attitude towards Royall. Royall did not argue or explain how it is capable of a defamatory meaning concerning him. We conclude that Royall did not raise a genuine issue of material fact with respect to grounds 1, 2, 3, 4, 5, 6, 7, 10, 13, 14, 18, 19, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 39, 40, 42, 43, 44, 45, 46, 47, 48, 49, 51, 53, 54, 56, 59, 60, 61, 62, 63, and 64, and that the trial court erred by denying the no-evidence motion for summary judgment with respect to those grounds.

In summary, we have examined the 79 grounds in the no-evidence motion that address statements in the book and have concluded that Royall did not raise a genuine issue of material fact regarding any of the grounds. We conclude that the trial court erred by denying the no-evidence motion for summary judgment with respect to grounds 1 through 79. We resolve issue four in appellants' favor.

### AIDING/ABETTING AND RATIFYING DEFAMATORY STATEMENTS

In their sixth issue, Main and Encounter argue that Royall did not produce more than a scintilla of evidence to support his claims that they "intended to assist, and actually assisted and encouraged, each of the other Defendants in committing libel." Ground 82 in the no-evidence motion for summary judgment asserted: "There is no evidence that Defendants have 'aided and abetted' the libel of any other person. *See* (Pl.'s 3d Am. Pet. at para. 69)." Ground 83 asserted: "There is no evidence that Defendants have 'sponsored, financed, authorized, and/or ratified' the libel of any other person. *See* (Pl.'s 3d Am. Pet. at para. 70)."

Grounds 82 and 83 generally challenged Royall's evidence to support the claims for aiding, abetting, and ratifying defamation and did not assert that there was no evi-

dence of a specific element of each of those claims. As a result, the motion is not sufficiently specific. TEX.R. CIV. P. 166a(i) (stating that "motion must state the elements as to which there is no evidence") & cmt. (1997) (stating that "conclusory motions or general no-evidence challenges to an opponent's case" are not sufficient); *Weaver v. Highlands Ins. Co.*, 4 S.W.3d 826, 829 n. 2 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *Abraham v. Ryland Mortg. Co.*, 995 S.W.2d 890, 892 (Tex.App.-El Paso 1999, no pet.). Consequently, we resolve issue six against appellants.

### GROUNDS NOT RAISED ON APPEAL

Main and Encounter did not appeal the trial court's denial of their no-evidence motion for summary judgment on grounds 80 and 81, which asserted that Royall did not produce more than a scintilla of evidence that he is not a limited-purpose public figure (ground 80) and that any extrinsic fact rendered any statement made by them libel per quod (ground 81). Because Main and Encounter do not raise grounds 80 and 81 as a basis for reversal of the trial court's order on appeal, those grounds are not before us and we do not consider them.

### TRADITIONAL MOTION FOR PARTIAL SUMMARY JUDGMENT

Main and Encounter argue that the trial court erred by denying their traditional motion for partial summary judgment. The motion raised three issues: (1) whether Royall is a limited-purpose public figure, (2) whether the statements are about matters of public concern, and (3) whether Main and Encounter are "members of the electronic or print media." These issues affect Royall's burden below. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776; 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (stating that a private plaintiff who sues a

media defendant over an issue of public concern bears the high burden of showing the defendant published a defamatory falsehood with actual malice); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990) (same); *McLemore*, 978 S.W.2d at 571 (stating that a public figure bears the higher burden of showing that the defendant published a defamatory falsehood with actual malice). We previously decided issue three in our analysis of the jurisdictional question. We reverse the trial court's order denying the traditional motion for partial summary judgment with respect to whether Main and Encounter are members of the electronic or print media. And we conclude that we do not need to decide the remaining two issues because they do not affect the final disposition of this appeal. *See* TEX.R.APP. P. 47.1 (stating court of appeals must address every issue necessary to final disposition of appeal); *Cates*, 927 S.W.2d at 626.

### CONCLUSION

We reverse the trial court's order denying the no-evidence motion for summary judgment with respect to grounds 1 through 79 and render judgment that Royall take nothing by his claims on those grounds. We affirm the trial court's order denying the no-evidence motion for summary judgment on grounds 80, 81, 82, and 83. We reverse the trial court's order denying the traditional motion for partial summary judgment with respect to whether Main and Encounter are members of the electronic or print media. We remand this cause to the trial court for further proceedings consistent with this opinion.