**AFFIRM; and Opinion Filed August 15, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-15-00353-CV**

**MANSIK & YOUNG PLAZA LLC, YOUNG HO KIM,
SUN HUI KIM, AND DAVID KIM, Appellants**
**V.**
**K-TOWN MANAGEMENT, LLC D/B/A KTN US, IP INVESTMENTS, LTD.,
ODES H. KIM, JI HONG PARK, AND CHUL SEUNG PARK, Appellees**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-12729**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Brown, and Schenck
Opinion by Justice Brown

Appellants Mansik & Young Plaza, LLC (Mansik & Young), Young Ho Kim, Sun Hui

Kim, and David Kim sued appellees K-Town Management, LLC d/b/a KTN US (KTN US), IP

Investments, LTD., Odes H. Kim, Ji Hong Park, and Chul Seung Park for libel following the

publication of four articles in a weekly Korean newspaper. The trial court granted appellees'

motion to dismiss under the Texas Citizens Participation Act (TCPA). In this appeal, appellants

contend the trial court erred in dismissing their claims because the TCPA does not apply and

because they established a prima facie case of libel and erred in denying their motion for limited

discovery. For the following reasons, we affirm the trial court's order of dismissal.

BACKGROUND

According to appellants' pleadings, in 2008, appellant Mansik & Young purchased a 46,000 square foot office building in Dallas known as the Crown Plaza building. The other appellants, Young Ho Kim, his wife Sun Hui Kim, and his brother David Kim, are members of Mansik & Young. Young Ho Kim is very well known in the Texas Korean community, as well as in the national Korean community and in South Korea. He is the Chairman of the Federation of Korea Associations USA and former President of the Dallas Korean American Society. In May 2014, a real estate broker approached Young Ho Kim about selling the Crown Plaza building to the Korean Cultural Center of Dallas (KCCD) to be used to establish a center for the North Texas Korean community. Young Ho Kim agreed to sell the building to the KCCD for $1.5 million. The sale would result in a financial loss to Mansik & Young, but Mansik & Young was willing to sell as a donation to the KCCD. This agreement was later terminated, but the parties reached a second agreement for the sale of the building for the same price. The sale was scheduled to close in November 2014.

Appellee KTN US publishes a weekly newspaper, *Korean Town News*, in Dallas for the Korean community. The publication also appears online. Appellee Odes Kim is the owner and publisher of KTN US, appellee Ji Hong Park is its president, and appellee Chul Seung Park is its editor. In four consecutive issues in September and October 2014, KTN US published a series of articles about the proposed sale of Mansik & Young's building to the KCCD. The articles were written and published in Korean. English translations of the articles were filed with the trial court. The first article is attributed to Chul Seung Park, and the other three are attributed to a "special reporting team." Each article included at least one photograph of the building or the surrounding location.

In late October 2014, after publication of the fourth article, appellants sued appellees for libel, asserting the articles contained defamatory statements. Appellants alleged that appellees wanted to stop the sale of the Crown Plaza building to the KCCD so that appellee IP Investments could sell the KCCD its own building. In the factual background section of their petition, appellants listed specific statements that they asserted constituted libel per se.

Appellees filed an answer generally denying appellants' allegations and asserting special exceptions and affirmative defenses. They asserted that public funds were being raised to purchase the cultural center. Appellees later filed a motion to dismiss all of appellants' claims under the TCPA, asserting they were sued in retaliation for publishing the articles. Appellants filed a response to the motion to dismiss and attached various exhibits to the response. A few days before the hearing on the motion, appellants filed an emergency motion to take the deposition of appellee Chul Seung Park, the editor of KTN US, and moved to continue the motion to dismiss. At the hearing, appellees' attorney made the uncontroverted statement that the sale of the building had gone through as planned. The trial court denied appellants' request for discovery and granted appellees' motion to dismiss. The court's order dismissed appellants' claims with prejudice and awarded attorney's fees to appellees. This appeal followed.

Before addressing appellants' issues, we first summarize the four articles as follows:

**1. September 26, 2014 article: "Korean Community, Professionals, and Others Calling Our Office for Complaining Angry with 'Exclusion of Fairness, Clarity'"**

The first article referred to appellants but does not mention them by name. It stated that Koreans have become increasingly worried since the announcement of the building selection for the KCCD. The newspaper had received "continuous phone calls of complaints with a kind of indication of, 'It's a kind of deception of Koreans by a tactics of trying to reduce the burden of rental fees for KSD [Korean Society of Dallas] office and by a card game in which the building owner was colluded in a 'Go-stop' game." The article indicated that callers are worried about

–3–

future operational problems caused by purchasing the building with a loan and operating with the building rental income. It stated, "Accordingly, KTN (Korea Town News) will review the impropriety as well as the possible future problems of the building, future operation and maintaining the ownership of the building contracted for the Korean Cultural Center of Dallas."

The article gave the opinions of four specific people, one who wished to remain anonymous and three identified by only one initial, who were unhappy with the building selection. The anonymous person had participated in fundraising for the building, but was "regretting very much and strongly denouncing the Promotion Committee's purchase of the building." Mr. K, an experienced building inspector, was completely disappointed in the building site. He listed numerous problems with the building, including "loan, . . . resale or asset value 0, [u]nder the highway, . . . few parking spaces, internal structure, . . . feels like a haunted one. Mr. K was also of the opinion that the "poongsu condition" was "like building a house on a running water." (According to the pleadings, poongsu is a Korean term for bad karma.) Mr. K also stated "looks like cheating Koreans." Mr. L, who had an angry voice on the phone, asked, "Do you know who is the owner of the Crown Plaza building?" He added that the "registered names are the brothers, the Senior Vice-chair of Korean Society of Dallas (KSD) and the Chairman of the board of directors of the Federation of Korean Society in US (FKSUS)." According to Mr. L, it is a collusion between those representatives of the KSD and the FKSUS. He noted the contract was rapidly done as the price was very low. He also stated that the Crown Plaza building was known as problematic due to "renting was not going well." Mr. L stated that others shared his opinion that "a real suspicious unclear reason existed" for selecting this building. Mr. P could not calm his rage because he saw the building had no value for resale or as an asset. He expressed concern that it would be difficult to make the payment for the bank loan with the rental income, especially since it was proposed some of the office space would be

converted into cultural center space. Mr. P also thought the City would never allow the proposed 10,000 square foot auditorium due to safety concerns.

The article also stated that, according to the North Texas Korean Journalists Association, it was a "very regrettable thing the Promotion Committee made a purchase based on a cheap price and with a bank loan." The association proposed forming an "Operation Committee" of the cultural center of fair objective people to operate "against a one-way decision by the KSD or the Promotion Committee."

**2. October 3, 2014 article: "Crown Plaza Appraisal Value $1.3 Million"**

This article stated that after the newspaper published the first article in the series "meaningful phone calls of Koreans are continuing daily." It noted that Mr. Lim had researched the property on the Dallas County Appraisal District's website. He entered the owner's name "mansik" on the website. Lim learned that Mr. Young Ho Kim bought the building in 2009 for $1.8 million and in 2010 the value dropped to $1.3 million. If the purchase price is $1.5 million as reported, Kim sold the building for $200,000 more than its appraised value and "the Promotion Committee purchased higher price with the public money and loan, and then, isn't it giving damage to the Koreans?" Mr. Lim referenced other potential building sites and asked, "why purchase the Crown Plaza building with $1.5 million?" According to Mr. Lim, the deal could not have happened "unless it is collusion between the owner and the buyer."

KTN US asked a Korean real estate broker to evaluate the deal. The broker said it would be "OK" to see the building's appraisal value as the actual dealing price due to its secluded location and rentals not doing well. He could not understand why "they claimed $150,000 lower cost whereas $200,000 higher than the county appraisal."[1] It is customary for a building in bad condition to sell for less than the tax value. A Korean real estate developer told the newspaper

---

[1] The fourth article indicated that the owner of the building had received an offer of $1.65 million for the building.

that the building was constructed in 1971 and it may cost $700,000–800,000 to modify it for the center's use.  Another "informant" asked, "who is going to give the building to Korean community where one can get $150,000 more, and the Korean community is being enticed by a few guys who play Go-stop Card Game."

The final paragraphs of the article refer to the various suspicions of those protesting against the "irresponsible contract for the building with the money collected from Korean community."  One person said the contract was "full of suspicion from one to ten."  Those suspicions included:  the hurried nature of the contract, the fact that no realtor or attorney was hired for the purchase and sale of a $1.5 million building, the lack of a detailed professional inspection of the building, and a $100,000 non-refundable condition.[2]  The article also stated it is impossible to modify the space for a 10,000 square foot performance hall based on the current number of parking spaces.

The article mentioned that the next article in the series would be on "Improper Selection of Location." It listed a phone number and stated, "We are gathering information and critiques related to this matter from knowledgeable Koreans without fear."

**3.  October 10, 2014 article:  "The Worse Approach Secluded Location 'Traffic Hell'"**

This article did not mention the owner of the building by name or otherwise.  It stated that an increasing number of Koreans are expressing their "Uncomfortable Feelings" for the purchase of the cultural center building.  Opposition is strong among "old timers" against the "thoughtless action of the Promotion Committee as it disrespected the Korean community." "With the money Korean community gave to and relied on them, they bought an old and secluded area building, and increasing number of people are saying that the reason is not understandable at all."

---

[2] The second contract for the sale of the building required the buyer to pay a nonrefundable earnest money deposit of $100,000.

The article included the opinions of "Mr. J so and so." He was angry with the Promotion Committee and unhappy with the idea of making payments for the building from the rental income. He thought that if a performance hall was created in the building, there would be "red ink" even if the rest of the space was rented out. Mr. J also expressed concern with the age of the building, the traffic conditions near it, and the inadequate number of parking spaces to support a performance hall.

KTN US's reporting team visited the Crown Plaza building. The article noted the one-lane roads to the building. It stated that if lots of Koreans gathered there for a wedding, birthday celebration, or other cultural event, it would be an "unimaginable traffic hell."

The closing section of the article had the subtitle "The Decision of the Building with 'Worst Condition' Hid." It reported that the Promotion Committee publicly announced only "the aspect of cheap building" during a press conference. Other building conditions were "behind the scene." A real estate developer and a building construction professional insisted that the committee's emphasis on the cheap cost of the building was to cover the bad intention of hiding the building's problems. The newspaper conducted a questionnaire about the building, and over 90% of the people who responded were worried about the "unclear process" by the Promotion Committee.

**4. October 17, 2014 article: "Building Purchase with Full of Suspicion 'Who's Responsible for Maintenance Cost'"**

This article reported that at a press conference the co-chairs of the Promotion Committee said the building's owner gave the building to the Korean community for $1.5 million even though there was another offer of $1.65 million. A caller to the newspaper who identified himself as an experienced dealer of buildings in Dallas said that "this talk" is a "Colluded Go-stop Card Game." He indicated that although the building's current appraisal value is $1.3 million, in the market "it would be difficult to deal even in $800,000." The caller "proved

–7–

$800,000 is the current market price" for the building by deducting taxes, insurance, utilities, repairs, and cleaning costs from the annual income generated by the building and applying the capitalization rate. However, if the KCCD modifies the building to include public space such as a performance hall, "talking of income is nonsense."

The article reported that the three members of the KCCD's board of directors should have been making decisions regarding the center's building. Instead, the members of the Promotion Committee decided everything. The co-chairs of the committee included the President of the KSD and its Chairman. As such, it looks like the KSD is controlling the committee.

"Mr. J so and so," a professional realty dealer, said that even buildings with better locations and environments are having difficulty renting. He knew of "lots and lots" of buildings available for $20 per square feet. Mr. J said he knew the Kim brothers bought the building in April 2008 for $1.8 million. Mr. J denounced the deal, asking how can one trust it without any broker?

Readers of the paper who had visited the building continued to complain. A housewife who had made a donation to the fund felt the committee had betrayed her. A donut store owner said he was suspicious the moment he heard the KCCD purchased the building. The final sentence of this final article in the series called for the committee to "do the best to clear the suspicion without any doubt in front of the Korean community."

## APPLICABILITY OF THE TCPA

We turn to appellants' first issue in this appeal, which is whether appellees met their initial burden to show the TCPA applies. The stated purpose of the TCPA is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury. TEX.

CIV. PRAC. & REM. CODE ANN. § 27.002 (West 2015); *see In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (purpose is to summarily dispose of lawsuits designed only to chill First Amendment rights). To promote these purposes, the TCPA provides a means for the expedited dismissal of unmeritorious suits that are based on, related to, or in response to a party's exercise of its right of free speech, right to petition, or right of association. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a); *Pickens v. Cordia*, 433 S.W.3d 179, 183 (Tex. App.—Dallas 2014, no pet.).

To prevail on a motion to dismiss, the movant bears the initial burden to show by a preponderance of the evidence that the action is based on, relates to, or is in response to the party's exercise of the right of free speech. *Id.* § 27.005(b). The "exercise of the right of free speech" is broadly defined as "a communication made in connection with a matter of public concern."[3] *Id.* § 27.001(3). A matter of public concern includes an issue related to: 1) health or safety; 2) environmental, economic, or community well-being; 3) the government; 4) a public official or public figure; or 5) a good, product, or service in the marketplace. *Id.* § 27.001(7); *see Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015).

If the movant satisfies the burden to show the TCPA applies, the trial court must dismiss the lawsuit unless the plaintiff establishes by clear and specific evidence a prima facie case for each essential element of the claim in question. *Id.* § 27.005(c). Even if the plaintiff meets this burden, the court must still dismiss the lawsuit if the movant establishes by a preponderance of the evidence each essential element of a valid defense. *Id.* § 27.005(d). In determining whether to grant or deny a motion to dismiss, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. *Id.* § 27.006(a). We review de novo the trial court's determinations that the parties met or failed to meet their

---

[3] "Communication" includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic. TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1).

burdens of proof under section 27.005. *D Magazine Partners, L.P. v. Rosenthal*, 475 S.W.3d 470, 479–80 (Tex. App.—Dallas 2015, pet. granted).

Appellants contend appellees failed to establish that the articles were matters of public concern. In their motion to dismiss, appellees asserted that the articles involved a matter of public concern because the KCCD is devoted to the well-being of the Korean community in North Texas and the KCCD's purchase of the building may be deleterious to the Korean community. Appellants argue that the article was about a private business transaction between private parties. We agree with appellees. The articles at issue were about the proposed sale of an office building to the KCCD for use as a community center. Further, the KCCD was to purchase the building in part with funds raised by the public. Appellants' own pleadings assert that Young Ho Kim was willing to sell the building to the KCCD because it would benefit all Koreans in North Texas. We conclude the articles related to the community well-being and thus involved a matter of public concern. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7). We overrule appellants' first issue.

## PRIMA FACIE CASE

Because appellees met their initial burden, appellants then bore the burden to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). In their third issue, appellants contend the trial court erred in dismissing their claims because they presented clear and specific evidence establishing a prima facie case for each element of their libel claim. *Id.* § 73.001 (West 2011) (elements of libel). Prima facie evidence is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Lipsky*, 460 S.W.3d at 590 (quoting *In re E.I. DuPont du Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)).

Appellants contend the statements at issue constitute libel per se. Libel is defamation expressed in written or other graphic form. TEX. CIV. PRAC. & REM. CODE ANN. § 73.001. Libel tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue or reputation. *Id.*; *Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013). Defamation's elements include: 1) the publication of a false statement of fact to a third party, 2) that was defamatory concerning the plaintiff, 3) with the requisite degree of fault, and 4) damages, in some cases. *In re Lipsky*, 460 S.W.3d at 593. The status of the person allegedly defamed determines the requisite degree of fault. A private individual need only prove negligence, whereas a public figure or official must prove actual malice. *Id.* Finally, the plaintiff must plead and prove damages, unless the statements are defamatory per se. *Id.*

The common law distinguishes defamation claims as either per se or per quod. *Id.* at 596. Defamation per se refers to statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed. *Id.* If the court must resort to innuendo or extrinsic evidence to determine that a statement was defamatory, then it is libel per quod. *Meisel v. U.S. Bank, N.A.*, 396 S.W.3d 675, 680 (Tex. App.—Dallas 2013, no pet.). Defamation per se is broken down into separate categories of falsehoods. For example, accusing someone of a crime, of having a foul or loathsome disease, of engaging in serious sexual misconduct, or remarks that adversely reflect on a person's fitness to conduct his business or trade are deemed defamatory per se. *In re Lipsky*, 460 S.W.3d at 596. Whether a statement qualifies as defamation per se is generally a question of law. *Id.*

In their pleadings and their response to the motion to dismiss, appellants pointed to the following allegedly false statements in the articles they maintain are defamatory per se:

1. Contract was rapidly done as the price was very low.

2. Crown Plaza Appraisal Value $1.3 Million.

3. The price Mr. Young Ho Kim bought in 2009 was $1.8 million and from 2010 it dropped to $1.3 million and it continues up today.

4. But according to the news media, the purchase price of $1.5 million was contracted and it was announced cheaper than the current price in the press conference. If the posted price is correct, then, Mr. Young Ho Kim sold it $200,000 higher.

5. And the Promotion Committee purchased higher price with the public money and loan, and then, isn't it giving damage to the Koreans?

6. Their claim is that if there was no realtor or attorney hired for such purchase and selling of $1.5 million worth building, those handlers had given up their trust themselves.

7. An unidentified caller purports to analyze the financial statement of Crown Plaza and determined that "$800,000 is the current market price."

8. The current appraisal value is $1.3 million, but in the market he firmly said it would be difficult to deal even in $800,000.

9. Crown Plaza's current income of $12,000 per month.

Appellants contend that at least some of these statements are so obviously injurious to a plaintiff's reputation that they require no proof of injury. But the majority of these statements concern the value of the building, not appellants. There are statements about the appraisal value of the building, the purchase price, and its market value. The statements indicate the sales price was greater than the appraisal value of the building and greater than its market value. The articles also mentioned the income the building generated from tenants and questioned whether that amount would be sufficient to make the loan payments. Other statements involve the contract. Appellants rely on statements the contract was rapidly done and done without a realtor. The statement that mentions the Promotions Committee suggests that the KCCD was "giving damage to Koreans" by selecting the Crown Plaza building to purchase. A few other statements are set out in appellants' brief, such as statements that the building had bad poongsu and was worthless. At best, the statements indicate Mansik & Young was profiting from the sale of the

–12–

building to the KCCD, when it claimed to be losing money on the sale, and the building was not a good choice for the KCCD. The statements appellants have alleged to be false and defamatory do not fall into any of the categories that are considered libel per se. They fall short of accusing any appellant of a crime or adversely reflecting on one's fitness to conduct his business. *See, e.g., Watson v. Hardman*, No. 05-15-01355-CV, 2016 WL 3626091, at *5–7 (Tex. App.—Dallas July 6, 2016, no pet. h.) (statements accusing plaintiffs of stealing publicly solicited charitable funds were defamation per se); *Shamark Smith Ltd. P'ship v. Longoria*, 03-14-00698-CV, 2016 WL 1039003, at *2 (Tex. App.—Austin Mar. 11, 2016, no pet.) (mem. op.) (statement that business owner, who had done work on building owned by other parties, had stolen components or contents of the building accused business owner of crime and adversely reflected upon his fitness to conduct his business); *Bennett v. Comput. Assocs. Int'l*, 932 S.W.2d 197, 200 (Tex. App.—Amarillo 1996, pet. denied) (statement that plaintiff was thief and crook who had stolen computer software fell within parameters of slander per se). The statements are not so obviously harmful that general damages can be presumed and thus do not amount to libel per se.[4] Even if the statements could be considered libel per quod, appellants have not attempted to establish a prima facie case for the element of damages in their libel claim. *See Bedford v. Spassoff*, 485 S.W.3d 641, 653 (Tex. App.—Fort Worth 2016, pet. filed).

In their brief, appellants acknowledge that in isolation some of the statements may not be actionable. But they assert the overall gist of the articles was false. A publication's gist is its main point, material part, or essence, as perceived by a reasonable person. *Tatum v. The Dallas Morning News, Inc.*, No. 05-14-01017-CV, 2015 WL 9582903, at *10 (Tex. App.—Dallas Dec. 30, 2015, pet. filed). Appellants contend the gist of the articles was that the Kim parties took

_____

[4] To their response to the motion to dismiss, appellants also attached a list of sixty-one "Innuendos" from the articles. By their nature, innuendos do not amount to libel per se. *See Meisel*, 396 S.W.3d at 680.

advantage of KCCD by selling it a cheap and damaged property at a price in excess of market value or appraised value.

Texas law recognizes that a publication may be entirely true in its details, yet still convey a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing them. *Main v. Royall*, 348 S.W.3d 381, 393 (Tex. App.—Dallas 2011, no pet.). In other words, the law permits liability for a publication that gets the details right but fails to put them in the proper context and thus gets the gist of story wrong. S*ee Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). When a plaintiff alleges that the gist of a publication defamed him, we construe the allegedly defamatory publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it. *Main*, 348 S.W.3d at 393.

Here, appellants have not properly raised a gist claim. *See id.* at 394. In their petition, they alleged appellees published defamatory statements that were false. Their pleading sets out specific statements from the articles they contend amount to libel per se. Appellants did not plead that the gist of publication was false or make this assertion in their response to appellees' motion to dismiss or even at the hearing on the motion. *Cf. Turner*, 38 S.W.3d at 113 (court rejected defendant's argument that plaintiff waived theory that broadcast as a whole defamed him where pleadings alleged "the gist of the broadcast is substantially false and defamatory"). They used the term "gist" for the first time in their appellate brief. We have examined the allegedly false statements and conclude that appellants have not established a prima facie case of libel.[5] We conclude the trial court did not err in granting appellees' motion to dismiss. We overrule appellants' third issue.

---

[5] Appellants also pleaded causes of action for business disparagement, slander of title, civil conspiracy, tortious interference with a contract, tortious interference with prospective relations, piercing the corporate veil of KTN US and IP Investments, and declaratory relief. In their brief, appellants do not assert that they established a prima facie case with respect to the elements of any of these other causes of action. They have

–14–

## APPELLANTS' MOTION FOR LIMITED DISCOVERY

In their second issue, appellants contend the trial court erred in denying their motion seeking limited discovery. About a month after appellees moved to dismiss under the TCPA, on February 12, 2015, appellants filed an emergency motion requesting permission to take the deposition of appellee Chul Seung Park, the editor of KTN US. The motion asserted that Park voluntarily requested a meeting with Young Ho Kim. Park met with Young Ho Kim and David Kang the day before the motion was filed. During the meeting, Park expressed his guilt about the articles and apologized repeatedly for writing them. He stated he was under a lot of pressure to write articles about Young Ho Kim personally. Park told Young Ho Kim he had submitted his resignation because he could not deal with the pressure Odes Kim was putting on him to write articles about Young Ho Kim. Appellants attached to their emergency motion affidavits from Young Ho Kim and David Kang with testimony about the meeting.

The filing of a motion to dismiss under the TCPA typically suspends all discovery until the court rules on the motion. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(c); *Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016). When good cause exists, however, the TCPA permits limited discovery relevant to the motion. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(b); *Greer*, 489 S.W.3d at 443. We review an order denying a party's request for discovery under the TCPA for an abuse of discretion. *Walker v. Schion*, 420 S.W.3d 454, 458 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Appellants describe Park as "the most important witness" and assert his deposition would have shown the intent behind the articles as well as whether there was any investigation done and whether there were real sources. They maintain they demonstrated good cause because the information sought was material and its necessity was not the result of their intentional or

---

therefore not challenged the trial court's dismissal of their other claims. *See Wholesale TV & Radio Advert., LLC v. Better Bus. Bureau of Metro. Dallas, Inc.*, No. 05-11-01337-CV, 2013 WL 3024692, at *4–5 (Tex. App.—Dallas June 14, 2013, no pet.) (mem. op.).

indifferent conduct. Further they assert no harm or undue delay would befall appellees as a result of a short continuance.

When it considered the motion to dismiss, the trial court had before it the affidavits of Young Ho Kim and Kang detailing what Park said in the meeting. The court could have concluded this evidence provided sufficient information for purposes of determining the motion to dismiss and that further discovery was not needed. We cannot say the trial court abused its discretion in denying the request to take Park's deposition.

Further, we have determined that the statements appellants contends are defamatory are not of such a nature that they amount to libel per se. Our disposition of this appeal therefore does not depend on whether appellants produced evidence of the intent behind the publication of the articles. The request for the deposition is therefore moot. *See Bilbrey v. Williams*, No. 02-13-00332-CV, 2015 WL 1120921, at *15 (Tex. App.—Fort Worth Mar. 12, 2015, no pet.) (mem. op.); *Walker*, 420 S.W.2d at 458–59 (inability to obtain testimony on element of malice was immaterial where plaintiff did not have evidence of other elements of his defamation claim). We overrule appellants' second issue.

We affirm the trial court's order of dismissal.

/Ada Brown/
ADA BROWN
JUSTICE

150353F.P05

–16–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

MANSIK & YOUNG PLAZA LLC,
YOUNG HO KIM, SUN HUI KIM AND
DAVID KIM, Appellants

No. 05-15-00353-CV        V.

K-TOWN MANAGEMENT, LLC D/B/A
KTN US; IP INVESTMENTS, LTD.; ODES
H. KIM; JI HONG PARK, AND CHUL
SEUNG PARK, Appellees

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-12729.
Opinion delivered by Justice Brown, Justices
Lang-Miers and Schenck participating.

        In accordance with this Court's opinion of this date, the trial court's order of dismissal is
**AFFIRMED**.

        It is **ORDERED** that appellees K-TOWN MANAGEMENT, LLC D/B/A KTN US; IP
INVESTMENTS, LTD.; ODES H. KIM; JI HONG PARK, AND CHUL SEUNG PARK recover
their costs of this appeal from appellants MANSIK & YOUNG PLAZA LLC, YOUNG HO
KIM, SUN HUI KIM AND DAVID KIM.


Judgment entered this 15th day of August, 2016.